774 P.2d 252

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Charles I. FAIN, Defendant–Appellant.**

No. 15414.

Supreme Court of Idaho.

April 4, 1989.

Rehearing Denied May 30, 1989.

84

Van G. Bishop, Nampa, for appellant.

Jim Jones, Atty. Gen., argued, and Lynn E. Thomas, Sol. Gen., Boise, for respondent.

## ON DENIAL OF PETITIONS FOR REHEARING

HUNTLEY, Justice.

This appeal has been protracted and no doubt agonizing to those directly involved. We have heard oral argument on several occasions and have been presented with more than one troubling issue requiring resolution. The pertinent facts are these: Charles I. Fain was convicted of first degree murder, lewd and lascivious conduct with a minor and first degree kidnapping of nine-year-old Daralyn Johnson. He was sentenced to death. Fain's appeal first came before this Court in March of 1985, for automatic review pursuant to I.C. § 19–2827 and upon several claims of error regarding both the conduct of the trial and the imposition of the death sentence. In August of 1985, this Court ordered further briefing on the single issue of whether Fain was denied due process and a fair trial as a result of the state's failure to preserve certain swabs of bodily fluid taken from the victim. After hearing oral argument thereon in November 1985, this Court suspended Fain's appeal to enable a post-conviction proceeding to take place, and to raise and resolve certain factual issues regarding Fain's claim that potentially excul-patory evidence was destroyed by the State by its failure to preserve certain swabs of bodily fluid taken during the autopsy of the victim.

The trial court issued findings on remand in an order on petition for post-conviction relief in March 1987, finding that tests of Fain established conclusively that Fain was a Type A secretor. Therefore, the swabs might have been exculpating had they disclosed semen from other than a Type A secretor. On remand, the trial court also found that Dr. Droulard, a pathologist who performed an autopsy on the victim, inadvertently discarded the swabs while assisting in the preparation of a sex crime kit. Fain argues that his due process right to fair trial was impacted as a result of the State's failure to preserve potentially exculpatory evidence. We respect that argument, particularly in view of the weighty evidence used to convict Fain and affirm the conviction. We discuss each of his assignments of error in turn.

## I. THE PRELIMINARY HEARING

■ Fain argues that the evidence adduced at the preliminary hearing was insufficient to permit the magistrate to bind him over for trial. He claims that while the State presented evidence to establish that a crime had been committed, it totally failed to introduce evidence linking him to the crime. At a preliminary hearing, the state must prove only that a crime was committed and that there is probable or sufficient cause to believe that the defendant committed it. I.C.R. 5.1(b). *State v. Gibson,* 106 Idaho 54, 675 P.2d 33 (1983). This test may be met by means of circumstantial evidence supportive of reasonable inferences on the part of the magistrate, and a reviewing court may not substitute its judgment for that of the magistrate as to the weight of the evidence. *Rideout v. Superior Court,* 67 Cal.2d 471, 62 Cal.Rptr. 581, 432 P.2d 197 (1967).

■ In reviewing the testimony adduced at the preliminary hearing, we conclude that there was competent evidence, including reasonable inferences therefrom, to

show probable or sufficient cause that the crimes charged had been committed and that the defendant was guilty of their commission. First, an automobile matching the description of Fain's uniquely painted automobile was seen in the vicinity of the abduction prior to the victim's disappearance. It matched the description of the automobile in which the child was allegedly abducted. Also, the child's abductor was described as having "long, brown hair and a beard," which description matched that of the defendant. John Michael Thompson, an acquaintance of Fain, testified that Fain had asked him, "What would you say if I told you I killed someone?" Thompson also testified that Fain had threatened him. The magistrate concluded that such a threat indicated a guilty state of mind. A sample of Fain's pubic hair was found to be similar to pubic hairs found in the victim's panties, and evidence was presented that Fain's shoe tread could have made a footprint found and photographed near where the victim's body was found. While none of the above factors standing alone would be sufficient to permit the magistrate to hold Fain to answer, the cumulative evidence supports the finding that there was probable cause sufficient to charge Fain with the crimes. Hence, the magistrate did not err in holding Fain to answer and the district court properly upheld the magistrate's ruling.

## II. ADMISSION OF CELLMATES' TESTIMONY

■ Fain contends that the trial court erred in admitting the testimony of Bobby Roberson and Ricky Lee Chilton, two inmates who shared a cell with Fain. Fain's assignment of error is based on his contention that Roberson and Chilton had been placed in his cell by the State in order to elicit incriminating information from him. Clearly, admission of statements made by an imprisoned defendant who is represented by counsel would violate the sixth amendment if the statements are deliberately elicited by governmental agents. *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); *United States v. Henry*, 447 U.S. 264, 100 S.Ct.

2183, 65 L.Ed.2d 115 (1980); and, *State v. LePage*, 102 Idaho 387, 630 P.2d 674 (1981). However, the sixth amendment does not forbid admission of an accused's statements to a jailhouse informant who, placed in close proximity to the accused, does not make any effort to stimulate conversations regarding the crime charged. *Kuhlmann v. Wilson*, 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986).

In *Kuhlmann*, a jailhouse informant was placed in close proximity to the defendant and instructed to ask no questions but to listen for information regarding the crime with which defendant was charged. The informant listened and surreptitiously wrote notes detailing what defendant said. The Supreme Court held there was no sixth amendment violation, as "the defendant must demonstrate that the *police and their informant* took some action, beyond merely listening, that was designed *deliberately to elicit* incriminating remarks." *Kuhlmann*, 477 U.S. at 459, 106 S.Ct. at 2630. (Emphasis added.) *See also, Lightbourne v. Dugger*, 829 F.2d 1012 (11th Cir. 1987).

■ Fain was in custody and under indictment at the time Roberson and Chilton were in his cell. He was also represented by counsel. However, at a mid-trial suppression hearing, Roberson and Chilton both testified that they were not informants collecting information for the State, that they were in no way induced by payment or other favorable treatment to elicit information for the State, and that they were not acting on any government instructions to obtain evidence. On the basis of that evidence, the trial court concluded that Roberson's and Chilton's testimony should not be suppressed in that neither man was an informant collecting information for the State. The trial court concluded that any incriminating statements which Fain had made to his cellmates were not the result of any deliberate action by the government or its agents. The court's ruling on the suppression motion was clearly grounded in his belief of Roberson's and Chilton's accounts of the circumstances under which Fain spoke to them in his cell. Because of

the trial judge's ruling denying the suppression motion, we may infer that he found Roberson's and Chilton's testimony at the suppression hearing credible. The determination of whether a witness is credible is one of fact, and in the context of a suppression hearing, is to be made by the trial court. *Jones v. Superior Court,* 4 Cal.3d 660, 94 Cal.Rptr. 289, 483 P.2d 1241 (1971).

■ Fain also contends that the trial court erred in refusing to require Bobby Roberson to take a psychiatric or a polygraph test. Fain claims that Roberson had a history of mental problems and that, since Fain's conviction was obtained almost entirely on the basis of circumstantial evidence, the issue of the admissibility of Roberson's testimony was not a minor matter but a major issue and had the trial court required Roberson to take a psychiatric or polygraph test, Fain would have attempted to introduce the results of the test in order to show that Roberson had a motivation, reason, tendency or predisposition to lie. There is no authority for such a procedure and we find no error in the trial court's denial of the request.

### III. TRANSCRIPT OF FAIN'S STATEMENT

■ At trial, Officer Newton testified as to statements Fain made during a taped police interview. The trial court disallowed the introduction of the tapes and the 58 page transcript thereof. The State did not introduce the transcript, but Officer Newton simply related his recollection of part of the conversation. Fain requested that the entire transcript be admitted into evidence; he did not limit his request to those portions of the transcript which explained, qualified or were relevant to that part of the conversation regarding which Newton testified. Such limited, relevant portions would have been admissible under the then existing Idaho evidentiary practice, which practice is now articulated in Idaho Rule of Evidence 106:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

While we note that the State did not introduce a writing, the rationale of the above rule would seem to apply where, as here, the State introduces evidence of an oral ˙ communication which has been reduced to writing, and other portions of that conversation, also reduced to writing, "ought in fairness to be considered contemporaneously with it." However, since Fain's counsel failed to tailor his request in any respect so as to move for the admission of only those other parts of his statement which might be relevant in the context of Officer Newton's testimony, the trial court committed no error in refusing to admit the full transcript of the taped interview or the tapes themselves.

### IV. FAIN'S POLYGRAPH TEST

Fain further argues that the trial judge committed reversible error by not admitting evidence of the results of Fain's polygraph test. Fain contends that with the exception of the testimony of the two cell mates, he was condemned by evidence which was wholly circumstantial. He argues that since he has consistently asserted his innocence, the critical issue for the jury was whether he or the two cell mates were telling the truth. Fain had taken a polygraph test prior to his arrest. We conclude that the trial court did not err in refusing to admit the test results.

■ As a general rule, results of polygraph examinations are inadmissible absent a stipulation by both parties. *Hopkinson v. Shillinger,* 645 F.Supp. 374 (D.Wyo.1986) *reh'g den.* 648 F.Supp. 141; *Wilkie v. State,* 715 P.2d 1199 (Alaska Ct. App.1986); *State v. Sanford,* 237 Kan. 312, 699 P.2d 506 (1985); *Fernandez v. Rodriguez,* 761 F.2d 558 (10th Cir.1985); *State v. Montes,* 136 Ariz. 491, 667 P.2d 191 (1983); *State v. Crispin,* 671 P.2d 502 (1983); *Aguilar v. State,* 98 Nev. 18, 639 P.2d 533 (1982); *State v. Brown,* 64 Or.App. 747, 669 P.2d 1190 (1983); *State v. Rupe,* 101 Wash.2d 664, 683 P.2d 571 (1984). Where

stipulated polygraph results may be admitted, the defendant's participation in the examination must be free and voluntary. The trial court has discretion to exclude evidence if it finds that an examiner was not qualified or that the conditions under which the test was administered were unfair. The opposing party must be permitted to cross-examine the examiner as to his or her expertise, the reliability of polygraph examinations, the accuracy of the apparatus used, and all other points reflecting on the accuracy of the polygraph both in general, and in the particular case. Also, the jury must be instructed that the examiner's testimony as to the results of the test is not conclusive, but is to be taken only as an expert opinion. *State v. Rebeterano*, 681 P.2d 1265 (Utah 1984). In the instant case, the prosecution did not stipulate to the admission of Fain's polygraph exam.

Moreover, the courts of many other states have held that results of polygraph examinations are not admissible in a criminal trial, regardless of whether the polygraph testimony is exculpatory. *U.S. v. Rodriguez*, 765 F.2d 1546 (11th Cir.1985); *U.S. v. Nelson*, 606 F.Supp. 1378 (S.D.N.Y. 1985); *U.S. v. Grandison*, 780 F.2d 425 (4th Cir.1985), *rev'd* on other grounds, 479 U.S. 1075, 107 S.Ct. 1269, 94 L.Ed.2d 130 (1987); *U.S. v. Brevard*, 739 F.2d 180 (4th Cir.1984); *State v. Beachman*, 189 Mont. 400, 616 P.2d 337 (1980); *State v. Antone*, 62 Haw. 346, 615 P.2d 101 (1980); *Sheppard v. State*, 670 P.2d 604 (Okla.Crim. App.1983). Federal law is in accord. *U.S. v. Skeens*, 494 F.2d 1050 (D.C.Cir.1974); *U.S. v. Jenkins*, 470 F.2d 1061 (9th Cir. 1972), *cert. denied*, 411 U.S. 920, 93 S.Ct. 1544, 36 L.Ed.2d 313 (1973); *U.S. v. Watts*, 502 F.2d 726 (9th Cir.1974); *U.S. v. De Betham*, 470 F.2d 1367 (9th Cir.1972), *cert. denied*, 412 U.S. 907, 93 S.Ct. 2299, 36 L.Ed.2d 972 (1973); *U.S. v. Gloria*, 494 F.2d 477 (5th Cir.1974), *cert. denied* 419 U.S. 995, 95 S.Ct. 306, 42 L.Ed.2d 267 (1974).

The foregoing authorities reflect the prevailing judicial view that the physiological and psychological bases for the polygraph examination have not been sufficiently established to assure the validity or reliability of test results. While scientific developments may one day refine the polygraph examination so that the results of the test may more frequently merit admission into evidence, we will not now overturn the trial court's exclusion of such results absent a stipulation by both parties.

■■■ Fain also objects to the trial court's decision to exclude evidence of a "psychological profile" prepared by the Federal Bureau of Investigation. The profile was nothing more than the Bureau's guess, after evaluating the facts then before it, as to the personality composite of the unidentified subject. A profile, of course, is not a physical scientific test conducted upon actual evidence using well-established scientific principles. Moreover, the profile simply would not have been relevant evidence as to the issue of the identity of the perpetrator of the crimes charged. We conclude that the trial court did not err in refusing to admit the "psychological profile."

## V. THE DESTROYED SWABS

After the state had recovered the victim's body, Dr. Droulard, a pathologist, performed an autopsy. The autopsy was conducted with the assistance of Officer Victor Rodriguez, a deputy sheriff with the Canyon County Sheriff's Department. During the course of the autopsy, Dr. Droulard used swabs to obtain fluid samples from the victim's body. The swabs were obtained as part of a "sex crime kit." Prior to trial, defendant moved the court to compel the prosecution to produce the "sex crime kit." That motion read, in part:

1. Previously this court ordered the State to turn over certain evidence to the State Laboratory for independent inspection.

2. From the inspection performed by the laboratory, Criminalist Pam Server has determined the presence of spermatozoa on the anal smear produced by the State.

3. The State did not produce nor deliver to the lab the vagina, throat, nose and anal swabs which, according to page 10

of Dr. Droulard's autopsy report, were "given to Deputy Sheriff Victor Rodriguez for submission to the forensic laboratory."

4. Criminalist Server has advised defense counsel that she is reasonably certain that by examining the swabs referred to above, and in particular the anal swab, she could determine the blood type of the offender of Daralyn Johnson.

5. It has been forensically established that blood grouping factors are secreted in physiologic fluids other than blood, and that one such fluid is semen. *See* 2 Wecht, *Forensic Sciences*, Section 25.-09(d)(2)(i), pages 25–90: Criminalist Server will so testify.

6. If the swabs are produced and the blood type determined is found not to be the defendant's blood type, such evidence will scientifically exclude the defendant from the spermatozoa found, and will exculpate him.

7. It is therefore vital to the defense that the swab prepared by Dr. Droulard and delivered to the State be produced for scientific examination.

8. The defendant's counsel was advised of the scientific discovery of spermatozoa only on Tuesday, October 11, 1983.

Prior to trial, defense counsel argued the above motion, informing the trial court that the evidence was material because it "could either include the defendant as a possible suspect, *or specifically exclude him and be exculpatory evidence on his behalf.*" (Emphasis added). The prosecutor informed the trial court that he had difficulty complying with the defendant's request because he did not know where the swabs were. The trial court stated that if the swabs were available, then the defendant would be entitled to a reasonable opportunity to examine them. The prosecutor stated that he would produce the swabs if he could find them. The discussion concluded with the trial court asking the prosecutor to follow up on the matter and if the prosecutor could locate the swabs, he was to produce them for examination by the defense.

Immediately prior to the time of trial, defense counsel argued a motion to dismiss the charges on grounds that the defendant would be denied due process of law and a fair trial because the State had been unable to produce the swabs which were the subject of the pretrial motion to compel discovery. In support of the motion, defense counsel argued that Dr. Droulard, the physician conducting the autopsy, had by affidavit avowed that he had turned the swabs over to Officer Rodriguez of the Sheriff's Department; that the FBI officials by affidavit and disposition had indicated that, although they had received the sex crime kit from Officer Rodriguez, they had never received the swabs; and that had the defendant had access to the swabs, it is possible that the blood type of the victim's assailant could have been determined, and that the results could have exculpated the defendant in that it could have eliminated him as the offender.

Defense counsel cited *Idaho v. Leatherwood,* 104 Idaho 100, 656 P.2d 760 (App. 1982) and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) for the proposition that the prosecution must disclose to an accused, upon request, evidence material either to guilt or to punishment and that failure to do so violates the due process clause of the fourteenth amendment, *irrespective of the good faith or bad faith of the prosecution.* Defense counsel further cited *State v. Ward,* 98 Idaho 571, 569 P.2d 916 (1977), for the proposition that where the prosecution has a duty to disclose, that duty includes the requirement that it use *earnest efforts* to preserve evidence for possible use by the defendant.

Responding to defendant's argument, the prosecutor presented the testimony of Pamela Server, a forensic chemist at the State Crime Laboratory in Boise. Ms. Server's testimony on direct examination tended to establish that semen samples could be scientifically tested and could be helpful in determining the identity of a criminal suspect, or more precisely, could possibly exclude or exonerate certain suspects.

The prosecutor stated that he had spoken by phone with Victor Rodriguez, the depu-

ty sheriff to whom Dr. Droulard had referred in his autopsy report. The prosecutor represented that Rodriguez had told him "that the procedure at the hospital at the time the autopsy was conducted was to the effect that the physician who performed the autopsy collected all of the samples, put the samples in the sex crime kit, the sex crime kit was then sealed at the hospital. That sex crime kit was then, by Officer Rodriguez, tendered to the FBI lab in Washington, D.C."

The prosecutor further stated that he had spoken with Bill McInnis, an F.B.I. agent who informed the prosecutor that he had received the sex crime kit and had broken its seal and that there were no swabs in the kit.

The trial court denied defendant's motion to dismiss for two reasons: (1) it found that the State never had possession of the swabs; and (2) it determined that, at best, had the defendant had access to the swabs, any results of testing of the swabs would have produced evidence only as to the sexual molestation charges and not as to the homicide charge, the homicide being the result of asphyxiation. This ruling was made over defense counsel's objection that many of the prosecutor's statements were hearsay and that Dr. Droulard's affidavit, submitted at the preliminary hearing, contradicted Officer Rodriguez's representation that Dr. Droulard had discarded the swabs.

During the course of trial, outside the presence of the jury, an FBI special agent examiner, Douglas W. Deedrick, testified that, at the time he examined the sex crime kit in question, there were no anal, vaginal or oral swabs contained in the kit.

At trial, the prosecution called Dr. Droulard to the stand. During cross-examination Dr. Droulard testified that he had taken swabs of the rectal, vaginal and oral areas of the victim's body, used some of them to make slides, and that he had turned some of the swabs over to a hospital technologist and that he had given the remainder of the swabs to Deputy Sheriff Victor Rodriguez for inclusion in the sex crime kit.

At trial, Officer Rodriguez testified that he had been present at the time Dr. Droulard had conducted the autopsy. He testified that he had had possession of the sex crime kit for the sole purpose of assisting Dr. Droulard in the doctor's examination of the victim's body for evidence. He also stated that he observed the doctor perform the vaginal, anal and oral swabbing. His testimony conflicted with Dr. Droulard's testimony in that he stated that Dr. Droulard had not given him the swabs for the sex crime kit, but had instead thrown the swabs in the garbage.

On remand ordered by this Court, the trial court found that if he had to choose, he was of the opinion that it was Dr. Droulard who had discarded the swabs.[1]

---

1. Attached hereto is an Appendix, page 1 of which is a photocopy of the cover of the Sex Crime Kit. The upper document on page 2 is a photocopy of outer envelope # 2 in which genital swabbing should be placed, which is initialed by F.B.I. agents Douglas W. Deedrick and William B. McInnis, which suggests the results may have been completed and something put in the envelope.

The lower portion of page 2 to Appendix A is a photocopy of the inner envelope to envelope # 2, which would supposedly contain the actual swabs. It also is initialed suggesting it may have contained something.

Envelope # 2 contained specific written directions regarding creation and preservation of the genital swabs. It is most difficult to understand the testimony of Officer Rodriguez in light of these explicit instructions.

As already mentioned, Rodriguez testified that Droulard discarded the swabs. Droulard testi-

fied that he gave them to Rodriguez. If Officer Rodriguez's testimony is to make sense, it means that Rodriguez sealed and deposited an empty envelope into the kit.

The trial court's finding on remand that, if forced to choose, he would believe the testimony of Rodriguez would mean that at some point Rodriguez would be standing there with an empty envelope in his hand. One would think at that point there would be a conversation between the doctor and officer about the need to fill the empty envelope, but neither the doctor nor the officer testified as to any conversation taking place between them. Indeed, Rodriguez testified that it did not occur to him to question Dr. Droulard. We find this entire state of events, as well as the conflicting testimony thereon, most peculiar.

A further, curious factor is that at some time someone with handwriting dissimilar to that of

At the close of the State's case-in-chief, the defense counsel argued that the trial court should dismiss the case. He stated:

Prior to the commencement of trial a motion was filed in regards to the destruction of evidence. Specifically the swabs taken at the time of the autopsy. Now that the testimony for the State is completed, it is compelling that the Court dismiss this case on that motion for dismissal.

Structure of the motion for dismissal was that it's evidence, it's potential exculpatory evidence, and the prosecuting attorney, through presentation of evidence, and upon statements to the Court, advised the Court that the swabs were never taken, and never delivered to the police department.

Now that we have concluded the evidence, Dr. Droulard has specifically stated in his testimony here today, and reaffirmed his autopsy report and affidavit, which is before the Court, as well as his testimony in the preliminary hearing transcript; that he did take the swabs, and he did deposit those to Officer Rodriguez.

Officer Rodriguez in his testimony as I recall indicated that he had given the swabs to the doctor, but that he never received the swabs back.

The criminalist has testified that given the swabs, she may have been able to exclude the defendant as a contributor of the sperm by typing of the blood. The word "may have been able" is not destructive to this argument for had the evidence been preserved, the defendant would have been able to pursue an avenue of exculpation which have [sic] now been closed by him—by state action.

This type of exculpatory evidence is even more critical now, because of the individuals of the jail, Roberson and Chilton. They have come down and they have testified that the defendant says he had intercourse with the girl. That he was only—that—that he was the only molester involved.

Therefore, it now is critical from a life and death standpoint for the defendant when we cannot pursue that avenue for the jury because the State destroyed, lost, or failed to preserve, whatever, whatever term we use, the evidence which we can pursue.

. . . .

In attempting to refute the defendant's argument, the prosecution stated:

[T]he evidence is not conclusive that the State ever did have possession of those swabs. There is inconsistent evidence. One witness, Dr. Droulard, stated that he did give the swabs to Detective Rodriguez. Detective Rodriguez, just as emphatically, emphasizes that he did not ever receive the swabs from Dr. Droulard.

Without a conclusive showing that the State had those, I believe Mr. Bishop's motion is unfounded; and even if the State did have them, his motion is unfounded, because of the testimony of Pam Server prior to the trial; that the possibility of obtaining a blood type grouping from those specimens were contingent upon several "if's." If enough semen was present. If it was not contaminated. If the types of blood characteristics were present in that semen, if it was even there; and from that it would not in any way be error on your part, Your Honor, to dismiss this motion because of the iffy contingency of the defense motion.

This would be a mere tangential procedural technicality not warranting a dis-

---

the two F.B.I. agents wrote on the outer envelope of "Step 2 Genital Swabbing":

"Oral, vaginal and anal smears part of evidence 8."

If that were written on the envelope at the time of the autopsy, it would suggest that a knowing decision was made to ignore preserving the swabs as required by Step 2 and using the Step 9 smear samples as a substitute. This possibility is, of course, directly contrary to the testimony of Rodriguez and does not square with the fact that envelope # 2 was sealed and sent to the F.B.I. In fact, our suspicions are further aroused by the fact that envelope 2 was at one time sealed. When samples are neither taken nor preserved, sealed envelopes for the preservation of such evidence are not submitted. Here, no saliva samples were taken, so envelope 8 was neither sealed nor inserted into the completed Sex Crime Kit.

missal of this case, and we would submit it on. that argument.

The trial court denied defendant's motion.

 We agree with appellant that under certain circumstances due process requires that the state preserve the swabs. We do not, however, accept appellant's assertion that the state's failure to preserve the swabs requires the dismissal of the case. When evidence with a potentially exculpatory value to a criminal defendant has been lost or destroyed by the state, there is nothing the court can do to restore the defendant to *exactly* the same position he would have been in had the evidence been preserved. However, there are remedial measures which the trial court can and should employ to ensure that the defendant receives a fair trial even though he no longer has access to exculpatory material which the prosecution had at one time already gathered.

In the present case, the trial court properly denied defendant's motion to dismiss because, in light of the circumstances (*i.e.* strong cumulative evidence of guilt), dismissal would have been an extreme sanction not warranted by the particular facts. The district court concluded that even if the defendant had the semen samples available for testing, such samples would yield test results that would only be material as to the lewd and lascivious conduct charge and could not possibly exonerate the defendant as to the kidnapping and murder charges. However, as defense counsel appropriately points out, the state offered no motive for the kidnapping and murder *other than* the sexual attack. There is no evidence to suggest that the killer and the sexual violator were not the same person. Thus, exclusion of the defendant as the sexual offender could exclude him from the other charges as well.

In *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), the Court held that the due process clause of the fourteenth amendment does not require that law enforcement agencies preserve breath samples captured by an "Intoxilyzer" in order to introduce breath-analysis at trial and further explained the concept of constitutional materiality, which concept implicates the state's duty to preserve evidence. The Court stated:

> Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, see *United States v. Agurs,* 427 U.S. [97] at 109–110, 96 S.Ct. [2392] at 2400 [49 L.Ed.2d 342 (1976)], evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

467 U.S. at 488–89, 104 S.Ct. at 2534 (footnote omitted).

As explained below, swabs may possess an exculpatory value in that they may be tested and the results of those tests may exclude a criminal defendant from that class of persons who could have committed the offense. As a rule, the defendant does not have available to him other comparable evidence. Hence, under federal law the Constitution imposes on the states the duty to preserve semen samples which the state has already collected in a prosecution for sexual offenses as the samples might be expected to play a significant role in the suspect's defense.

Tests have been devised to type seminal fluid. These tests, while of value in helping to identify a rape suspect, are similar to blood tests in that they do not positively identify a person as the perpetrator of the crime but may exclude the person suspected. 65 Am.Jur.2d *Rape* § 63 (1972). Evidence regarding the analysis and identification of seminal fluid is not always conclusive for purposes of identification. It is nevertheless admissible and may have considerable bearing on cases dealing with rape, criminal assault, homicide, or a combination of all three. Seminal fluid can sometimes be typed by the same classifications as blood types. This means that seminal fluid found at the scene of a sex offense may be typed, and then matched or

compared with the blood type of the suspect or accused. *Although a person cannot be conclusively identified in this manner, the matching process may aid in excluding persons wrongfully accused of a sex crime.*

Under ideal conditions, seminal fluid may be typed or grouped in much the same manner as blood is typed—as type A, AB, B, and O. However, unlike blood, it is not always possible to type or identify human semen as representative of one of the four basic blood groups. The person from whom the sample is taken must be a so-called "secretor." It is estimated that from seventy-five to eighty percent of all human beings are considered to be "secretors;" that is, they possess, in fluids other than their blood, certain material properties that tend to be classified as would blood. Fain is a Type A secretor. In some instances, it has been possible to classify not only an individual's semen but also his saliva, fingernails, hair, and even fluid from a blister on some portion of his body. *See,* 2 A.L.R. 4th 500.

In *People v. Hitch,* 12 Cal.3d 641, 117 Cal.Rptr. 9, 527 P.2d 361 (1974), the California Supreme Court held that evidence is material if there is a reasonable possibility that the evidence would constitute evidence favorable to the defendant on the issue of guilt or innocence. The *Hitch* court held that the duty of disclosure of evidence to the defendant attaches in some form once the government has first gathered and taken possession of the evidence; *before the request for discovery has been made, the duty operates as the duty of preservation.*

The *Hitch* court cited *United States v. Bryant,* 439 F.2d 642 (D.C.Cir.1971) (*"Bryant I"*) (result affirmed after remand in *"Bryant II", United States v. Bryant,* 448 F.2d 1182 (1971)), which suggested that, while sanctions should be imposed in cases of bad faith suppression of evidence, "[a]n exception for good faith loss of important evidence must not be allowed to swallow the discovery rules, and the *burden of explanation on the Government must be a heavy one;* but criminal convictions otherwise based on sufficient evidence may be permitted to stand *so long as the government made 'earnest efforts' to preserve crucial materials and to find them once a discovery request is made."* 117 Cal.Rptr. at 17, 527 P.2d at 369. (Emphasis in original) (quoting 439 F.2d at 651–52). The *Hitch* court concluded:

> For the future, 'earnest efforts' will be defined quite strictly.... Of course, the regular procedures for preservation must be adequate to the task. Systematic non-preservation of tapes involving Government undercover agents—as in the cases before us—might be regular, but would be insufficiently protective of defendants' right to discovery. Accordingly, we hold that *sanctions for nondisclosure based on loss of evidence will be invoked in the future unless the Government can show that it has promulgated, enforced and attempted in good faith to follow rigorous and systematic procedures designed to preserve all discoverable evidence* gathered in the course of a criminal investigation. *The burden, of course, is on the Government to make this showing. Negligent failure to comply with the required procedures will provide no excuse ...* A right so crucial as that of disclosure ought not to be built on ... shifting sands. It ought, rather, to be protected by rules, systematically applied and systematically enforced. (Emphasis in part in original, in part added.)

117 Cal.Rptr. at 17, 527 P.2d at 369 (quoting 439 F.2d at 652) (footnote omitted).

In *People v. Nation,* 26 Cal.3d 169, 161 Cal.Rptr. 299, 604 P.2d 1051 (1980), the California court held that the prosecutor has the duty to disclose material evidence favorable to the accused even in the absence of a request from the defense. The *Nation* court further held that if the state recovers a semen sample of one who has made a sexual assault or has perpetrated a rape or attempted rape, the authorities must take reasonable measures to adequately preserve the evidence and to make it available to the defense, noting that *an analysis of the semen sample might not only impeach the credibility of the prosecution's witnesses but also might com-*

*pletely exonerate the defendant.* The *Nation* court further stated, "[w]hether or not the police deem the crime sufficiently important to warrant such an identification analysis, *they cannot make the decision for the defendant.*" 161 Cal.Rptr. at 303, 604 P.2d at 1055 (emphasis added).

The *Nation* court established *as a matter of law* that with respect to semen samples obtained from the vagina of an alleged rape victim, the sample is *material evidence* requiring preservation. However, as the following cases illustrate, the sanctions to be imposed depend upon the particular circumstances attendant to the loss or destruction of the material evidence in each case. *People v. Moore,* 34 Cal.3d 215, 193 Cal.Rptr. 404, 666 P.2d 419 (1983).

In *State v. Mitchell,* 140 Ariz. 551, 683 P.2d 750 (1984), the Arizona Court of Appeals stated, "[w]e agree with the California court and hold that the law enforcement officers have a duty to preserve the semen samples in a rape case, including refrigerating them." 683 P.2d at 754. In *Mitchell,* the court held that the state's failure to preserve a semen sample did not merit dismissal of a count, but only the suppression of any blood-grouping evidence. In *Mitchell,* such evidence had not been suppressed at trial; however, the court held that in light of the overwhelming evidence in the case, including the victim's identification of the defendant, the trial court's failure to suppress constituted harmless error beyond a reasonable doubt.

The State contends that no consequences should attach to its failure to preserve the semen samples because Dr. Droulard was not working for the prosecution. This contention is not persuasive. In *State v. Vaster,* 99 Wash.2d 44, 659 P.2d 528 (1983), the court held that the duty to preserve evidence applies *not only to the prosecution, but also to its agents acting under prosecutorial authority.* In *Vaster,* the court concluded that even though the police did not have physical control over vaginal samples destroyed prior to the defendant's trial for rape, they were properly held responsible for their destruction, where their silence, in response to the medical center's

notice that the vaginal samples were to be destroyed, indicated permission, albeit unintentional, that the sample be destroyed.

Here, we are not suggesting that Dr. Droulard was biased in any way or that he approached the autopsy in anything but a professional manner. However, he made his examinations and took the samples at the request of deputy sheriff Rodriguez, who was present throughout the examination. Regardless of whether Officer Rodriguez's testimony as to what transpired with the swabs is accurate or whether Dr. Droulard's account is accurate, under *either* account it is clear that at all relevant times *either* Dr. Droulard *or* Officer Rodriguez had possession of the swabs, which samples might have contained material evidence where, as here, the defendant is charged with a sexual offense. Moreover, even if Dr. Droulard were *not* deemed to be a state agent, Officer Rodriguez, having at least constructive control of the swabs, should have used earnest efforts to prevent the doctor from disposing of the swabs if, as Officer Rodriguez testified, the doctor in fact disposed of the swabs.

More recently, the Arizona Court of Appeals required dismissal in both *State v. Youngblood,* 153 Ariz. 50, 734 P.2d 592 (App.1986), and *State v. Escalante,* 153 Ariz. 55, 734 P.2d 597 (App.1986). In *Escalante,* the state failed to preserve semen stain evidence which had the potential to exonerate the defendant. The court stated that:

> [w]hen identity is an issue at trial, and the police permit the destruction of evidence that could eliminate a defendant as the perpetrator, such loss is material to the defense and is a denial of due process. Dismissal is the appropriate remedy unless the evidence against the defendant is so strong that a court can say, beyond a reasonable doubt, that the destroyed evidence would not have proved exonerating. The cases that discuss the remedy for a denial of due process of this type do not speak in quite these terms. Instead, they tend to cast the inquiry in terms of prejudice to the defendant, *i.e.,* the denial of due process is prejudicial when the case against the de-

fendant is weak and not prejudicial when it is strong. We believe the result is the same regardless of how the test is framed.

Here we cannot say that the evidence against Escalante was so strong that the loss of the evidence was harmless beyond a reasonable doubt.

734 P.2d at 603.

In determining that the evidence was not so strong as to render the loss of evidence harmless beyond a reasonable doubt, the court noted the existence in that case of mistaken and conflicting identifications of both the attacker and the attacker's car.

In *Crockett v. State*, 95 Nev. 859, 603 P.2d 1078, 1081 (1979), the court stated, "[W]hen evidence is lost as a result of inadequate governmental handling, a conviction may be reversed." There the defendant was convicted of rape and second degree murder based entirely on circumstantial evidence. The court held that the failure of lab technicians to report blood-grouping tests of the vaginal swab which were possibly exculpatory, and the intentional discarding of a sperm slide so prejudiced the defendant as to violate his due process right to a fair trial. The Nevada court stated:

> Unfortunately, scientific verification is forever foreclosed because the government admittedly did not properly preserve the swab. Further, the sperm slide, which easily could have been preserved, was intentionally, though not maliciously discarded. The State now seeks to benefit from its own faulty procedures by urging factual possibilities which proper procedures might well have foreclosed. We think this approach is legally untenable. We cannot permit speculative inferences adverse to Crockett to be derived from the absence of evidence which the State should have preserved....
>
> This obviously is not a case where an otherwise prejudicial loss may be ignored on the ground that evidence of guilt is overwhelming.

603 P.2d at 1081–82.

In *Deberry v. State*, 457 A.2d 744 (Del. 1983), the court ruled that as a matter of prudence agencies that create rules for evidence preservation should broadly define discoverable evidence to include any material that could be favorable to the defendant. The *Deberry* court held that when examining the conduct of the state in the loss or destruction of evidence, the court should inquire whether the evidence was lost or destroyed while in the state's custody, whether the state acted in disregard for the interests of the accused, whether the state was negligent in failing to adhere to established and reasonable standards of care or police and prosecutorial functions, whether its acts, if deliberate, were taken in good faith or were reasonably justified, and whether the government attorneys prosecuting the case participated in events leading to the loss or destruction of evidence. It further held that certain kinds of evidence, including the testimony of persons who had custody of the material, any procedures for preserving evidence, specific practices followed in the particular case and steps taken to recover lost material after discovery of the loss, were relevant to the inquiry into the state's conduct and the loss or destruction of evidence. The *Deberry* court held that when physical evidence such as the defendant's clothing is lost or otherwise becomes unavailable through some apparent fault of the police, the state bears a heavy burden of overcoming defendant's claim of prejudice, *and a haphazard explanation of the loss will be insufficient.* The court concluded that the state's failure to produce the defendant's clothes upon request or to conduct scientific tests, as was done on the apparel of the alleged rape victim, *permitted the inference that any scientific evidence obtained from such items would have been favorable to the defendant.* In *Deberry,* the defendant was not only charged with rape but also with kidnapping and a weapons charge. There, the court concluded that the kidnapping and weapons charges necessarily were interrelated with the rape conviction and could not stand independent of it.

In the present case, the government's "explanation" of the loss of the swab sam-

ples was, at best, less than clear. Moreover, here, as in *Deberry*, the appellant was not only charged with a sexual crime but with additional crimes as well. Likewise, in the present case, those additional charges were interrelated with the sexual crime and it is unlikely that they would stand independent of it.

The State also contends that, even had the swabs been preserved, they would have been useless as yielding only inconclusive or unreliable test results. This argument is not relevant in a due process analysis. In *People v. Newsome*, 136 Cal.App.3d 992, 186 Cal.Rptr. 676 (1982), the court held that for purposes of determining whether to impose sanctions on the prosecution for failure to preserve a semen sample, a factual showing that a vaginal smear was taken from the complaining witness and that the swab showed the presence of seminal material required the trial court to treat the samples as material evidence, *despite the claim by the state that the swab was rendered immaterial in fact when the swab failed to yield useful test results when tested by the state*. In *Newsome*, the state argued that the swab was material evidence only in the abstract because two attempts to perform PGM typing yielded no useful results. There, the court concluded that the state's contention sidestepped the issue. The court stated:

> Assuming arguendo, that when tested ... the swab's failure to yield useful PGM results rendered it at that point immaterial in fact (although the possibility remains that a test for ABO group may have been successful), the question remains whether its uselessness is attributable to the government's failure properly to preserve the evidence....
>
> Moreover, in *United States v. Bryant* [citations omitted], the court held that the duty to preserve evidence applies to all discoverable evidence, and the tapes at issue in that case were no less discoverable because they were unintelligible; *"It is the defendant's right to discover such evidence and decide for himself...."* (Emphasis added.)

186 Cal.Rptr. at 681 (quoting from *United States v. Bryant* (*Bryant II*), 448 F.2d 1182, 1184, fn. 1 (D.C.Cir.1971)).

Even in the above cases which mandated dismissal of charges due to the state's failure to preserve material evidence, a method of analysis was utilized which is cognizant of the degree and weight of the evidence accumulated against the defendant as well as the degree of culpability of the State in failing to preserve material evidence. Indeed, a strong line of cases do more than just recognize the relative strengths and weaknesses of those variables, but actively balance the magnitude of the State's failure to perform its duty to preserve evidence against the degree of prejudice thereby sustained by the defendant. In *State v. Vaster*, 99 Wash.2d 44, 659 P.2d 528 (1983), the court adopted a "balancing approach" and noted that, in that case, "there [was] extremely strong evidence of guilt" including an "unusually detailed eyewitness identification." 659 P.2d at 534. The *Vaster* court affirmed the conviction of the defendant despite the State's loss of a vaginal sample. The court also distinguished the cases of *People v. Nation, supra,* and *Crockett v. State, supra,* noting that:

> While the rationale of these cases appears persuasive, we note with interest that in both cases other evidence against the defendants was relatively weak.

659 P.2d at 533.

This kind of "balancing approach" was also used in *United States v. Loud Hawk*, 628 F.2d 1139 (9th Cir.1979), cert. den. 445 U.S. 917, 100 S.Ct. 1279, 63 L.Ed.2d 602 (1980), wherein the court stated: "[t]he proper balance is that between the quality of the government's conduct and the degree of prejudice to the accused. The government bears the burden of justifying its conduct and the defendant bears the burden of demonstrating prejudice." *Id.* at 1152. *See* also, *United States v. Roberts*, 779 F.2d 565 (9th Cir.1986).

The Ninth Circuit is not alone in its adoption of such a "balancing test." In *State v. Bailey*, 144 Vt. 86, 475 A.2d 1045 (1984), the court affirmed defendant's conviction

for engaging in sexual acts with a person under the age of sixteen to whom he was not married, despite the state's failure to conduct testing calculated to show the presence of sperm on certain bedding present in the "rape kit." In balancing the "admitted negligence" of the State in failing to conduct the test against the prejudice to defendant from the denial of potential test results which were admittedly "relevant," the court stated that:

> [T]he omission must be evaluated in the context of the entire record. *United States v. Agurs, supra,* 427 U.S. at 112, 96 S.Ct. at 2402. We note there was strong evidence of defendant's guilt in this case. He made several damaging admissions to the arresting officer concerning his presence and conduct during the incident. He admitted to the officer that "he knew she was too young to be with him." We also note the fact that the complaining witness took the stand herself and testified in detail to the events of that day.

475 A.2d at 1052.

Recently, the balancing approach was again utilized in *Commonwealth v. Willie,* 400 Mass. 427, 510 N.E.2d 258 (1987). There, the court remanded to the trial court to conduct a determination of prejudice to the defendant from the commonwealth's failure to preserve certain semen deposits. The court noted that "[t]he Commonwealth's conduct is merely a factor to be weighed in determining its culpability. That culpability, if any, is then weighed along with the other two factors, materiality and prejudice, in determining whether, and to what extent, any remedy will be employed." 510 N.E.2d at 262. The court further noted that "[n]ormally, the remedy for suppression of exculpatory evidence is a new trial unless the Commonwealth's actions are so egregious that retrial would be unfair to the defendant, in which case dismissal may be appropriate. [Citation omitted]. Loss or destruction of evidence can engender similar sanctions." 510 N.E.2d at 262–63. Concurring in part and dissenting in part in *Willie,* Justice Liacos noted the disfavor in which the remedy of dismissal is held by the courts, quoting from

*People v. Kelly,* 62 N.Y.2d 516, 478 N.Y. S.2d 834, 837, 467 N.E.2d 498, 501 (1984), "[a]lthough the choice of 'appropriate' action is committed to the sound discretion of the trial court, as a general matter the drastic remedy of dismissal should not be invoked where less severe measures can rectify the harm done by the loss of evidence."

The remedy of retrial, rather than dismissal, was also found appropriate in *Commonwealth v. Chapman,* 255 Pa.Super. 265, 386 A.2d 994 (1978). In *Chapman,* the court ruled that where the undershorts of a defendant accused of rape had been destroyed between his first and second trial by the state and, where the absence of the undershorts denied the defendant the opportunity to prove conclusively that the undershorts belonged to someone else and perhaps thereby to persuade the jury that someone else was the rapist, but where the defendant had failed to utilize this evidence available to him in the first trial, a new trial including a missing evidence instruction rather than dismissal was the appropriate sanction.

In this case an appropriate instruction would have read similar to the following:

> You may take note of the fact that the state had obtained bodily fluid samples from the body of the victim, that such samples are, as a matter of law, material evidence in that scientific tests are available which may exclude an individual from that class of persons who could have committed the crime, that the state lost or destroyed the samples, and that the defendant therefore did not have an opportunity to conduct such tests. The fact that the state lost or destroyed the samples does not, in itself, require that you acquit the defendant. It is, however, one factor for you to consider in your deliberations.

Based on the foregoing analysis, we have determined that the State did not deprive the defendant of due process by failing to preserve the semen samples it had obtained.

Utilizing the "balancing approach" already .discussed, we note that the trial court specifically found on remand that the destruction of the swabs was inadvertent. Evidence adduced at trial included the testimony of two inmates who had shared a cell with Fain and who testified that he had claimed responsibility for the murder, and an admission made to another individual, from which it could be deduced that Fain had knowledge of the murder and its circumstances; a description of Fain's automobile furnished by a witness of the car in which the victim was last seen riding; and the existence of similarity between a sample of Fain's pubic hair and pubic hairs found in the victim's panties.

We have little doubt that the circumstantial evidence presented, and from which the jury clearly drew the inference of appellant's guilt, was sufficient to sustain a conviction. We have concluded that although the evidence against Fain is circumstantial, it is nonetheless significant and weighty. In particular, the testimony of more than one person to whom Fain allegedly admitted guilt, as in *Bailey, supra,* indicates to us that dismissal would be an overly severe sanction.

We have most carefully reviewed the record and have concluded that were we to remand this case for retrial with the appropriate instruction that, ante, there is no likelihood that the result would be changed. We therefore decline to reverse the conviction finding that any error was harmless beyond a reasonable doubt.

## VI. THE DEATH PENALTY

### A.

Among his many attacks upon the constitutionality of the Idaho death penalty procedure, Fain contends that article I, § 7 of the Idaho Constitution guarantees him the right to have a jury pass upon whether he should receive the death sentence, contrary to our holdings in *State v. Creech,* 105 Idaho 362, 670 P.2d 463 (1983), and, *State v. Sivak,* 105 Idaho 900, 674 P.2d 396 (1983).[2] We continue to adhere to our holdings in those opinions.

Fain also contends that the .constitutional requirement of proportionality has not been met in this case. The United States Supreme Court and this Court have held that the death penalty must be administered in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not. *Spaziano v. Florida,* 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340; *State v. Aragon,* 107 Idaho 358, 690 P.2d 293 (1984).

■ Comparing the circumstances and proof in this case to sentences imposed in similar cases, we cannot conclude that the sentence in the instant case was excessive or disproportionate. In 1983, in *State v. Creech,* 105 Idaho 362, 670 P.2d 463 (1983), this Court conducted an extensive review of Idaho murder cases. We find the sentence imposed in the instant case is not disproportionate to the sentence imposed in those cases reviewed in *Creech* where the death sentence was available as a form of punishment. We also have compared the instant case with our recent death penalty cases in *State v. Creech, supra,* and *State v. Sivak,* 105 Idaho 900, 674 P.2d 396 (1983), and find that the sentence imposed in the present case is not disproportionate to the sentences imposed in both of those cases.

---

2. The author and Justice Bistline continue to adhere to their dissents in *Creech, supra,* and *Sivak, supra,* and remain firm in their belief that the Idaho Constitution provides for *jury* participation in the capital sentencing process. We are further persuaded that a jury is required for the reasons articulated in *Adamson v. Ricketts,* 865 F.2d 1011 (9th Cir., 1988), but the majority of this Court does not concur with *Adamson* for the reasons articulated in *State v. Charboneau,* 116 Idaho 129, 774 P.2d 299 (1989). I write a separate opinion as to my view of the effect of *Adamson.*

Were I able to get a majority to reinvest Idaho juries with their constitutional powers in a given case, I would make the decision in that case *prospective* only and not apply it to other inmates on death row, which procedure has been approved by the United States Supreme Court in a line of cases including *Jenkins v. Delaware,* 395 U.S. 213, 218, 89 S.Ct. 1677, 1680, 23 L.Ed. 2d 253 (1969).

The crime committed in the instant case was an intentional act perpetrated upon a helpless victim who did not provoke the attack. The kidnapping, sexual attack and drowning were brutal and perverse and could only have been intended to kill the victim. The crime committed in the present case is the same type of crime as that committed in *State v. Aragon, supra.* In *Aragon,* the defendant was convicted of first degree murder and was sentenced to death based upon the beating death of an eight-month old child. Thus, we conclude that the sentence imposed in this case is proportionate to those imposed in similar death cases.

Finally, we consider whether the trial court's findings of factors in mitigation and aggravation in determining whether to impose the death penalty were proper.

## B.

Idaho's statutes and case law establish the limits for the factors properly to be considered as mitigating when making the determination of whether to impose the death penalty. In *State v. Small,* 107 Idaho 504, 690 P.2d 1336, 1338 (1984), this Court stated, "[i]t is improper for a legislature to limit the sentencing body's consideration of mitigating factors to those enumerated in a statute." *See also, State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981). In *Small,* we also emphasized that "the legislature's failure to list any mitigating factors in its capital sentencing scheme indicates its intent that the sentencing judge entertain the broadest of views in considering any and all matters appropriate to the determination of culpability," *supra,* 690 P.2d at 1338. *See* also, *State v. Owen,* 73 Idaho 394, 253 P.2d 203 (1953). The broadest of views must be entertained in considering all potentially mitigating factors.

The judge is also provided with express guidelines concerning aggravating factors in determining whether to impose the death penalty in I.C. § 19-2515. For the most part, the guidance provided in that code section is clear and appropriate. However, Fain contends that the trial court erroneously utilized I.C. § 19-2515(g) in assessing factors in aggravation in determining whether to impose the death penalty.

From the arguments and the evidence at trial in the instant case, the court found the following aggravating factors:

(a) The murder was especially heinous and cruel manifesting exceptional depravity in that the defendant, a man of thirty-five years of age, abducted a nine-year-old girl off the street; took her to a remote site where he sexually assaulted her and then killed her.

(b) The circumstances surrounding the killing exhibited utter disregard for human life and particularly as to an innocent child of tender years.

I.C. § 19-2515(g) provides:

The following are statutory aggravating circumstances, at least one (1) of which must be found to exist beyond a reasonable doubt before a sentence of death can be imposed:

(1) The defendant was previously convicted of another murder.

(2) At the time the murder was committed the defendant also committed another murder.

(3) The defendant knowingly created a great risk of death to many persons.

(4) The murder was committed for remuneration or the promise of remuneration or the defendant employed another to commit the murder for remuneration or the promise of remuneration.

(5) The murder was especially heinous, atrocious or cruel, manifesting exceptional depravity.

(6) By the murder, or circumstances surrounding its commission, the defendant exhibited utter disregard for human life.

(7) The murder was one defined as murder of the first degree by section 18-4003, Idaho Code, subsections (b), (c), (d), (e) or (f), and it was accompanied with the specific intent to cause the death of a human being.

(8) The defendant, by prior conduct or conduct in the commission of the murder at hand, has exhibited a propensity to commit murder which will probably constitute a continuing threat to society.

(9) The murder was committed against a former or present peace officer, executive officer, officer of the court, judicial officer or prosecuting attorney because of the exercise of official duty.

(10) The murder was committed against a witness or potential witness in a criminal or civil legal proceeding because of such proceeding.

Fain contends the aggravating factor denoted by the trial court as "(a)," reflecting the language of I.C. § 19–2515(g)(5), and "(b)," reflecting the language of I.C. § 19–2515(g)(6) above, overlap. We disagree.

The aggravating factors specified in §§ 19–2515(g)(5) and (g)(6) describe two quite different kinds of culpability, each of which has been legislatively identified as a sentencing factor of special importance in cases where the death penalty may be imposed.

■ Section (g)(5), referring to the special heinousness, atrociousness or cruelty of the murder and the depravity of the act, specifically refers to the personal culpability of the killer exhibited by the manner in which the crime was committed. Thus, this factor was described in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), as one that relates to cases where

the offense of murder was outrageously and wantonly vile, horrible and inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim.

*Gregg*, 428 U.S. at 165 n. 9, 96 S.Ct. at 2921 n. 9, 49 L.Ed.2d at 870 n. 9. See *Gregg*, at 193 n. 44, 96 S.Ct. at 2935 n. 44, 49 L.Ed.2d at 886, n. 44.

This court took the same approach to characterizing the meaning of factor (g)(5) in *State v. Osborn*, 102 Idaho 405, 631 P.2d 187 (1981):

What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies—the conscienceless or pitiless crime which is unnecessarily torturous to the victim.

102 Idaho at 418, 631 P.2d at 200, quoting *State v. Dixon*, 283 So.2d 1, 9 (Fla.1973), *cert. denied*, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974).

On the other hand, the "utter disregard" factor refers not to the outrageousness of the acts constituting the murder, but to the defendant's lack of conscientious scruples against killing another human being. In *Osborn*, the court explicitly construed the utter disregard factor as one referable to circumstances different from those encompassed by § 19–2515(g)(5):

Since we will not presume that the legislative intent was to duplicate any already enumerated circumstance, thus making I.C. § 19–2515(f)(6) mere surplusage [citation omitted], we hold that the phrase "utter disregard" must be viewed in reference to acts other than those set forth in Idaho Code §§ 19–2515(f)(2), (3) and (4). We conclude instead that the phrase is meant to be reflective of acts or circumstances surrounding the crime which exhibit the highest, the utmost, callous disregard for human life, i.e., the cold-blooded, pitiless slayer.

102 Idaho at 405, 631 P.2d at 187.

■ The particularly cold-blooded killer need not act sadistically or in a particularly outrageous fashion in order to commit a killing with utter disregard for human life. One who commits a crime in an especially heinous way is punished for the heinousness of his crime, not because he acted with utter disregard for human life, although it may be expected that most especially heinous, atrocious or cruel murders will have been committed with utter disregard for human life. See e.g., *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987).

We therefore decline to reverse the judgment and order imposing the sentence on the basis of the asserted overlapping of aggravating factors.

### C.

■ The fact that there is no overlap between I.C. § 19–2515(g)(5) and (6) does not conclude our consideration of the sen-

tencing. In another opinion issued by this Court today, we have held that the trial court may sentence the defendant to death only if the trial court finds that all the mitigating circumstances do not outweigh the gravity of each of the aggravating circumstances found, making imposition of death appropriate. *State v. Charboneau,* 116 Idaho 129, 774 P.2d 299 (1989). Here, the trial court imposed the death penalty for both the conviction of first degree murder and the conviction of first degree kidnapping. In each case the trial court found that the "mitigating factors" did not outweigh the "aggravating factors." It appears that the trial court incorrectly weighed all of the mitigating circumstances against all of the aggravating circumstances, collectively, rather than individually as required by *Charboneau.* For this reason, we vacate the sentence and remand for resentencing in accordance with our decision here and in *Charboneau.*

## VII. THE POST–CONVICTION ORDER

■ On May 15, 1987, this Court ordered the filing of supplemental briefs on the issues of the findings on remand regarding the destroyed and potentially exculpatory evidence and further ordered the consolidation of all collateral post-conviction issues into one single proceeding. Defendant Fain contends that this Court's order requiring such consolidation violated his constitutional right to equal protection since non-death penalty defendants are not required to raise and pursue all grounds for post-conviction relief under an equally restricted and limited time schedule. We disagree and reaffirm our position that such consolidation orders are appropriate in order to reasonably expedite the processing of these cases in a manner that both protects the defendant's right to fair trial, while also accommodating the public's interest in the elimination of endless delay occasioned by multiple, serial appeals. We have considered appellant's additional assignments of error and find them to be without merit.

Conviction affirmed, remanded for resentencing.

SHEPARD, C.J., concurs in the result.

BAKES, J., concurs in Parts I, II, III, IV, VI(A), (B) and (C), and VII; concurs specially in Part V.

HUNTLEY, J., concurs in part and dissents in part.

JOHNSON, J., concurs as to Parts I, II (Chilton), III, IV, VI(A) and (C), and VII; concurs specially as to Part VI(B); and dissents as to Parts II (Roberson), and V.

BISTLINE, J., concurs in Part I; concurs specially in IV; and dissents as to Parts II, III, V, VI, VII.

SHEPARD, Chief Justice, concurring in result.

I concur in the majority opinion except as to Part V in which I concur in the result.

As to Part V, I believe the majority's truncated view of the facts and its expressions of opinion regarding the autopsy procedures are unnecessarily critical of the autopsy personnel and their procedures.

The argument of Fain focuses on one small aspect of the autopsy procedures, *i.e.,* the insertion of Q-tip like swabs into the various body cavities. The purpose of the procedure is to impregnate the cotton swab with liquid within the body cavity, and to allow microscopic examination for the existence of sperm. If sperm is so found, further analysis can be made. The cotton swabs were not preserved, and from that fact the defense constructs the following argument. *If* sperm had been deposited within any of the body cavities, and *if* after the body's three-day immersion in water any such sperm remained, and *if* the swabbing had picked up any such remaining sperm, and *if* microscopic examination had revealed that the sperm depositor was a "secretor," and *if* therefrom tests thereof could determine the blood type of the sperm depositor, and *if* such a determined blood type differed from that of the defendant, conceivably such evidence would be exculpatory of Fain. Such an attenuated argument fails to consider the uncontested facts surrounding the autopsy procedures

which are not set forth in the majority opinion.

The undisputed record indicates that the pathologist, in accordance with standard medical procedures, used cotton Q-tip type swabs to collect samples of whatever fluid might be found in the vaginal, anal, nasal and oral cavities of the victim. Each swab was immediately thereafter wiped upon a glass slide for later microscopic examination. Tests were made upon the slides to determine if there was any sperm to be found in the victim's body cavities. Those slides gave no evidence of the presence of sperm. Those slides were preserved. Thereafter, "washings" were made of the body cavities, which washings were preserved by refrigeration, and while available to the defense at the time of trial, were never examined.

This portion of the defendant's argument on appeal is built upon the foundation that if the swabs themselves had been preserved, that a year and a half later they would have remained in a condition viable for examination for sperm; that such examination might have revealed results at variance to the slides containing the materials deposited thereon from the swabs; that if the swabs remained viable, and if they revealed the presence of semen, that such hypothetical semen might have revealed if the depositor thereof was a secretor, and if the depositor was a secretor a blood type could possibly be identified as different from that of Fain.

I suggest that such argument is nothing but hopeful speculation without any reasonable foundation therefor. An applicant for post-conviction relief has the burden of demonstrating by a preponderance of the evidence the allegations on which his petition is based. *Clark v. State,* 92 Idaho 827, 452 P.2d 54 (1969). Where as here there is competent and substantial evidence to support a decision made after an evidentiary hearing on an application for post-conviction relief, that decision will not be disturbed on appeal. *Heck v. State,* 103 Idaho 648, 651 P.2d 582 (Ct.App.1982); *Lipps v. State,* 94 Idaho 185, 484 P.2d 734 (1971); *State v. Hinkley,* 93 Idaho 872, 477 P.2d

495 (1970). Here, Fain was required to demonstrate that the lost swabs contained evidence that would be material to his guilt or innocence. As stated in *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), the "evidence must possess an exculpatory value that was apparent before the evidence was destroyed ..."

The majority strongly suggests that the swabs should have been preserved. There is no contention that standard autopsy procedures required such preservation of the swabs after smears had been made upon the glass microscopic slides. It is suggested that the existence of a "sex crime kit" required the preservation of the swabs. There is no showing in this record that such "sex crime kit," which was in the custody of a police officer present at the autopsy, constituted any legal authority which required the pathologist to vary his standard autopsy procedures. Likewise, there is no showing that the law enforcement officer was possessed of any authority to direct or supervise the conduct of the autopsy or to require that the pathologist vary his usual autopsy procedures.

Lastly, I would point out that the record discloses that prior to trial the defense refused to permit any testing of the sperm of the defendant. It was only at post-conviction proceedings when the absence of the swabs became apparent, that the defendant then indicated a willingness to have tests made of his sperm.

I would affirm the findings and conclusions of the trial court pertaining to the failure to preserve the swabs.

BAKES, Justice, concurring specially:

Part V of this Court's plurality opinion relies on *People v. Hitch,* 12 Cal.3d 641, 117 Cal.Rptr. 9, 527 P.2d 361 (1974), which states that "once the government has first gathered and taken possession of the evidence," there is a "duty of preservation ... before the request for discovery has been made," and a duty to disclose after the request for discovery is made. *Ante* at 92, 774 P.2d at 262. Furthermore, the opinion states that *"so long as the government made 'earnest efforts' to preserve crucial materials and to find them*

*once a discovery request is made,*" no constitutional violation has occurred. *Ante* at 92, 774 P.2d at 262. However, Part V of the opinion does not adequately relate all of the facts which were found by the district court in support of its conclusion that no due process violation occurred in this case. All of the witnesses testified that samples of the victim's various body cavity fluids were collected on swabs by Dr. Droulard, the pathologist, and the fluids on those swabs were then transferred onto glass slides which were tested and preserved. The only conflict in the testimony was whether, after the swabs were used to make the glass slides, they were discarded by the doctor, as Officer Rodriguez testified, or by Officer Rodriguez, as Dr. Droulard testified. The trial court, after observing the witnesses testify, resolved this conflict in the testimony, concluding that it was Dr. Droulard who discarded them. While the technician, Pam Server, testified that the fluids transferred onto the glass slides would not be as concentrated as the fluids on the swabs themselves, there is nothing in the record to show that Officer Rodriguez knew or should reasonably have known that when Dr. Droulard transferred the bodily fluids onto the glass slides that he was not employing accepted scientific means for testing and preserving evidence. I think it would be expecting too much of an ordinary police officer to understand that the medical doctor's actions in making the slides and then discarding the swabs was not an accepted scientific method of testing and preserving any potential evidence. The trial court specifically found that the destruction of the swabs was inadvertent. That finding is supported by the record. I believe the record also reflects that "the government made 'earnest efforts' to preserve the critical materials" within the meaning of the *Hitch* case relied on by the majority. *Ante* at 92, 774 P.2d at 262.

However, the most recent test enunciated by the United States Supreme Court regarding the states' obligation to preserve potentially exculpatory evidence was set out in *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). In that case, which also involved the preservation of swabs and other physical evidence in a sexual molestation case, the United States Supreme Court reversed the Arizona courts which had held that the state's failure to preserve semen samples from the victim's body (swabs) and clothing had violated due process. The United States Supreme Court rejected both the "earnest efforts" test, and the "negligent failure to preserve" test of *People v. Hitch,* 12 Cal.3d 641, 117 Cal.Rptr. 9, 527 P.2d 361 (1974), relied on in Part V of this Court's plurality opinion. The Court in *Arizona v. Youngblood,* stated, "The failure of the police to refrigerate the clothing and to perform tests on the semen samples can at worst be described as negligent." However, the Court held that was not enough to constitute a due process violation. The Court concluded by holding that "[w]e therefore hold that unless a criminal defendant can show bad faith on the part of police, failure to preserve potentially useful evidence does not constitute a denial of due process."

There is no evidence here of any bad faith upon the part of Officer Rodriguez. The trial court specifically found that it was Dr. Droulard, and not Officer Rodriguez, who discarded the swabs. The trial court further found that that discarding was inadvertent and not intentional. Accordingly, the trial court did not err in concluding that Fain's rights to due process were not violated.

HUNTLEY, Justice, concurring and dissenting.

While I support the death penalty and concur in the bulk of the majority opinion, I respectfully suggest that Idaho's present capital sentencing procedure is unconstitutional because it removes the jury from its constitutional fact-finding role. Our process violates the federal constitution for the reasons stated in *Adamson v. Ricketts,* 865 F.2d 1011 (9th Cir., 1988) and violates the Idaho Constitution for the reasons I have articulated in *State v. Creech,* 105 Idaho 362, 670 P.2d 463 (1983) and *State v. Sivak,* 105 Idaho 900, 674 P.2d 396 (1983). I will discuss each analysis in turn.

## I.

### The Jury as Fundamental to Preserving Democracy

The determination of the issue presented on appeal should be made in the context of the history and purposes of the right to trial by jury. Our forefathers wisely provided in Article 1, Section 7 of the Idaho Constitution: "The right to trial by jury shall remain inviolate ..." They so provided because they recognized that the jury system is the single most important guardian of the people's right to be protected from oppressive and overreaching government.

Few Americans realize that the right to jury trial in civil cases has almost been lost in England. English judges, with the acquiescence of a compliant bar, have totally eliminated the right to trial by jury in civil cases, except in cases of libel or slander. The English themselves seem to have forgotten the words of their eminent jurist, Blackstone, who wrote that trial by jury is:

> ... the glory of the English law ... [i]t is the most transcendent privilege which any subject can enjoy, or wish for, that he cannot be affected in his property, his liberty, or his person but by the unanimous consent of twelve of his neighbors and equals.

Blackstone Commentaries 79.

Some American judges and legislators have similarly lost touch with the following language in our Declaration of Independence:

> [George III] has combined with others to subject us to a jurisdiction foreign to our Constitution, and unacknowledged by our laws; giving his assent to their acts of pretended legislation: ... For depriving us, in many cases, of the benefits of trial by jury ...

The French philosopher and essayist, de Tocqueville, who understood and appreciated democracy in America with keener insight than any other observer of the Nineteenth Century, stated that the jury system in America:

> ... places the real direction of society in the hands of the governed ... and not in ... the government ... He who punishes the criminal ... is the real master of society. All the sovereigns who have chosen to govern by their own authority and to direct society, instead of obeying its direction, have destroyed or enfeebled the institution of the jury.

Those who believe in strict construction of our Constitution recognize that the judiciary's oath to "support and defend the Constitution" requires that we resist the temptation to enhance judicial power through encroachment into the provinces constitutionally delegated to the jury.

## II.

### The Federal Right to Jury Fact Finding in Capital Cases

In *Adamson v. Ricketts*, the 9th Circuit stated the issue:

> Adamson also contends that the Arizona statutory scheme for imposing the death penalty erroneously lists elements of the offense as factors to be determined by the sentencing judge, thus depriving him of his right to a jury decision on the elements of the crime in violation of the Sixth and Fourteenth Amendments. We agree.

The Idaho sentencing procedure under I.C. § 19–2515 is virtually identical in all material respects to the defective Arizona statutory scheme. Noteworthy is the fact that Idaho and Arizona are two of only four states which have the death penalty which have taken the jury out of the fact-finding process of making the ultimate determination as to whether the death penalty is appropriate. The fact that thirty-one of the thirty-five states which have the death penalty utilize the jury in making that determination speaks volumes as to what our Anglo–American traditions and constitutions require.

As the *Adamson* court noted:

> An aggravating "circumstance" which elevates a murder to a "death-eligible" murder in the penalty phase, remarkably mirrors the attributes of an essential element of the offense during the guilt phase of a trial. Like an element of a

crime, an aggravating circumstance in the Arizona scheme informs the prosecutor what facts must be proven to obtain a conviction. The circumstance must be proven beyond a reasonable doubt. The hearing is adversarial, with oral argument and the prosecution's presentation of evidence governed by the usual rules of evidence. The presiding trial judge must make findings on the existence or nonexistence of each of the statutory aggravating and mitigating circumstances. If the judge finds an aggravating circumstance, the burden then shifts to the defendant who must put on sufficient evidence of mitigation or the death penalty will be imposed. A.R.S. § 13–703; see also *Arizona v. Rumsey*, 467 U.S. 203, 210 [104 S.Ct. 2305, 2309, 81 L.Ed.2d 164] (1984). If the prosecution is unable to prove the existence of a single aggravating circumstance, like not proving an essential element, the defendant cannot be put to death. Cf. *Poland v. Arizona* [476 U.S. 147], 106 S.Ct. 1749, 1754 [90 L.Ed.2d 123] (1986) (Court framed the relevant [*39] inquiry as "whether the sentencing judge or the reviewing court has "decid[ed] that the prosecution has not proved its case for the death penalty and hence has 'acquitted' petitioners"); *Rumsey*, 467 U.S. at 212 [104 S.Ct. at 2310] (where findings of fact at sentencing hearing were all favorable to defendant, he was "acquitted" of the death penalty).

Although Idaho's majority in *Charboneau*, similarly to the judiciary in Arizona and the prosecutors in both states, urge that a trial court in finding facts as to aggravating circumstances is exercising a "sentencing determination" as distinguished from finding the elements of a death-eligible murder, their use of the language in justifying that position frequently results in Freudian slips which indicate otherwise. In fact, to rule for the state's position it is necessary to do exactly what the majority did in *Charboneau*, that is, engage in a circular argument, the majority reasoning at 116 Idaho page 146, 774 P.2d page 316:

To accept Jaimi's argument that the jury must be involved in determining whether aggravating circumstances exist, we would have to conclude that the aggravating circumstances listed in I.C. § 19–2515(g) are elements of first degree murder. We are unable to reach that conclusion. <u>The circumstances listed in the statute are clearly circumstances to be considered in sentencing and not elements of first degree murder.</u> It is not unconstitutional for a judge, instead of a jury, to determine whether any of the aggravating circumstances listed in the statute exist.

The sentence I have underscored is totally circular. Of course, if one can pronounce that the circumstances are part of sentencing and not part of the elements of a death penalty crime, then they are not elements of a death penalty crime.

The plain fact is, before a person is eligible to be executed, a *finding* must be made that the aggravating circumstance existed. That finding is typically a jury finding, it was a jury function in Idaho from territorial days through 1977, and is a fact to be found by the jury in all but four of the states which have the death penalty.

It could of course be argued that my position is circular if I were to take the underscored sentence from the majority opinion, *supra*, and restate it as follows:

The circumstances listed in the statute are not circumstances to be considered in sentencing but are elements of death-eligible murder.

However, I would submit that the issue is best resolved by recognizing that it is traditional and accepted jurisprudence that every factor required to prove a crime is considered an element of that crime. One cannot be sentenced to death without the finding of the aggravating circumstances having taken place and, thus, they would appear to be essential elements of the crime rather than some less important procedural matters occurring during sentencing.

The United States Supreme Court has not passed directly upon the issue presented in this case, but what it has written

about the jury and its function in death penalty cases indicates that the process would be best served by bringing the four states in line at this time.

Since the Court has held that death sentences must comport with the community's sense of evolving standards of decency and its legitimate desire for moral retribution, an essential question is whether judges alone can reliably reflect the communal values that are the source of the constitutionality of capital punishment.

By definition, juries, not judges, are "the cross-section of the community," reflecting community values. *Duren v. Missouri,* 439 U.S. 357, 359, 99 S.Ct. 664, 666, 58 L.Ed.2d 579 (1979). Only a representative jury assures "meaningful community participation." *Ballew v. Georgia,* 435 U.S. 223, 235, 98 S.Ct. 1029, 1036, 55 L.Ed.2d 234 (1978) (plurality opinion). Jurors, unlike judges, are selected to enhance the likelihood that they represent the whole range of community beliefs and backgrounds, *Taylor v. Louisiana,* 419 U.S. 522, 531–33, 95 S.Ct. 692, 698–699, 42 L.Ed. 2d 690 (1975); the different segments of the community bring to the representative jury "perspectives and values that influence both jury deliberation and result," *id.* at 532 n. 12, 95 S.Ct. at 698 n. 12. See *Humphrey v. Cady,* 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394 (1972). Moreover the sheer difference in size between a twelve-member jury panel and a single judge may bear significantly on the validity of a sentencing decision under the Eighth Amendment. Canvassing expert empirical studies, the United States Supreme Court has concluded that the likelihood that a decision in a criminal case correctly applies "the common sense of the community to the facts" increases with the number of decision-makers. *Ballew v. Georgia, supra,* 435 U.S. at 232, 98 S.Ct. at 1035.[3] Twelve individuals are obviously more likely to reflect the prevailing views of society than one person.[4]

A jury need not engage in questionable speculation to determine what community sentiment would say in a particular case. Its very function is to bespeak that community sentiment by exercising its own judgment. The jury's response is society's response. *Witherspoon v. Illinois, supra,* 391 U.S. at 519–20 88 S.Ct. at 1775–1776. "The jury ... is a significant and reliable objective index of contemporary values because it is so directly involved," *Gregg v. Georgia, supra,* 428 U.S. at 181, 96 S.Ct. at 2928. By contrast, judges cannot themselves speak for community sentiment. If they are to fulfill the demands of the Eighth Amendment by bringing evolving standards of decency and principles of retribution to bear in a capital punishment case, they can do so only indirectly since "[C]ourts are not representative bodies. They are not designed to be a good reflex of a democratic society. Their judgment is best informed, and therefore most dependable, within narrow limits." *Dennis v. United States,* 341 U.S. 494, 525, 71 S.Ct. 857, 875, 95 L.Ed. 1137 (1951) (Frankfurter, J., concurring). Unable to represent community sentiment, a judge must undertake to ascertain it. That is necessarily a difficult task,[5] made even more difficult because judges—whether considered in terms

---

3. *Ballew* also amassed considerable empirical evidence to prove that reducing the number of decisionmakers in a criminal case impairs the accuracy, fairness, thoroughness and consistency of the decision, generally to the detriment of the defendant. *Ballew v. Georgia,* 435 U.S. 223, 232–39 [98 S.Ct. 1029, 1035–38, 55 L.Ed.2d 234] (1978) (plurality opinion).

4. · Significantly, every state authorizing jury involvement in capital sentencing appears to require a jury of twelve persons. *S. Gillers, Deciding Who Dies,* 129 U.Pa.L.Rev. 63, n. 298.

5. Judges may theoretically have access to community sentiment through social contact, as well as through such sources as polls, editorials, journals, and newspaper reports. Cook, *Public Opinion and Federal Judicial Policy,* 21 Am.J. Pol.Sci. 567, 576 (1977). Unfortunately, these sources greatly overstate the willingness of members of the community to impose the death penalty on specific defendants for specific crimes. Research on jury behavior reveals that jurors are substantially more lenient when trying an actual case and sitting through deliberations than they will otherwise indicate. Aeisel & Diamond, *The Effect of Peremptory Challenges on Jury and Verdict: An Experiment in a Federal District Court,* 30 Stan.L.Rev. 491, 511–12 (1978) (shadow juries drawn randomly and not subject to peremptory challenges vote guilty far more often than real juries; probably because the

of race, sex, or economic class—do not reflect the wide range of backgrounds or beliefs within the community.[6] "[T]he reluctance of juries in many cases to impose the sentence [of death] may well reflect the humane feeling that this most irrevocable sanction should be reserved for a small number of extreme cases," *Gregg v. Georgia, supra,* 428 U.S. at 182, 96 S.Ct. at 2929. For a variety of reasons, judges appear less likely to reflect that same reluctance.[7]

As a means of reliably reflecting community sentiment on capital punishment, bringing lay jurors into the sentencing process " 'places the real direction of society in the hands of the governed ... and not in ... the government.' " Powell, *Jury Trial of Crimes,* 23 Wash. & Lee L.Rev. 1, 5 (1966) quoting de Tocqueville, *Democracy in America* 282 (Reeve Tran.1948). Quintessentially, the right to a jury "is granted to criminal defendants in order to prevent oppression by the government," *Duncan v.*

defendant's liberty was not in their hands). People who favor the death penalty in the abstract are more lenient when presented with descriptions of actual cases.

6. As of 1979 judges in state courts of general trial jurisdiction earned salaries ranging from $24,000 in Oklahoma to $54,205 in California, with a mean of approximately $41,000. Nat'l Center for St. Cts., Survey of Judicial Salaries 1 (Sept.1979). As of 1977 in these general jurisdiction courts, only 2.5 percent of the 5,155 judges were women, and 20 states had no women at all on these courts. Cook, *Women Judges: The End of Tokenism,* in *Women in the Courts,* 84, 87–88 (Nat'l Center for St. Cts. 1978). It appears that as of 1977 only 2.6 percent of the judges on these general trial courts were black. G.W. Crockett, Number and Distribution of Black Judges (March 1977) (unpublished charts on file with Nat'l Center for St. Cts.). Finally, the rigorous educational requirements for admission to the bar make it inevitable that the average educational attainment of judges will far exceed that of the community in general.

7. Kalven and Zeisel's classic report shows that judges and juries disagree in a substantial number of cases. In a study of 3576 trials, judge and jury reached the same decision about a criminal defendant only 72 percent of the time. H. Kalven & H. Zeisel, *The American Jury,* 68 (1966). In their specific study of the death penalty, the authors report that judge and jury disagreed about the imposition of a death sentence in 19 percent of the cases, *id,* at 436. To view the results yet another way, in those cases where one or both recommended death, judge and jury disagreed 60 percent of the time. In those cases in which either the judge or jury or both would have voted for the death penalty, in 40 percent, judge and jury agreed, and in 40 percent only the judge would have voted for the death penalty, yet in only 20 percent of the cases would the jury but not the judge vote for execution. Thus, the juries were essentially twice as lenient as the judges. *Ibid.* As a United Nations Report concludes:

"[A]mong the leading authorities in penal science, the supporters of abolition appreciably outnumber those who favour the retention of capital punishment. The specialists of the social sciences, penologists, doctors and writers on social science or criminology are, in their great majority, abolitionists. The supporters of capital punishment, apart from a number of political figures and persons holding high public office, are generally jurists with a traditional training and judges."

United Nations, Dept. of Economic and Social Affairs, Capital Punishment (ST/SOA/SD/9–10–64) (1968).

The reason for these differences may lie in the greater reluctance of judges to depart from what they perceive to be the letter of the law. See, *e.g., Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). Kalven and Zeisel discovered in more than one judge "a kind of envy of the freedom of the jury to reach a decision which he as a judge could not reach" *Kalven & Zeisel, supra,* at 428. The judge's role as a strict enforcer even restricts his discretion in sentencing decisions where that discretion would seem to be wholly lawful. As one judge said of draft evasion cases: "I am opposed to conscription. I also believe that the war in Vietnam is both immoral and impractical. My sentencing policies are based upon the fact that as long as law exists, it should be imposed to effectuate its intent and purpose." Cook, *Sentencing Behavior of Federal Judges:* Draft Cases —1972, 42 Cinn.L.Rev. 597, 623 (1973). At the same time, Cook's study also reveals that as judges (unlike individual jurors) accrue experience in a given type of case, their sentencing settles into distinct and regular patterns of severity or leniency, *id.,* at 602–03, so that the judge's first decision whether a person lives or dies may inspire far more deliberation and consideration than subsequent decisions. For individual jurors, however, the gravity with which they approach their decisions in capital cases will rarely be affected by such routinization.

Florida studies cited in *Gillers, supra,* note 3, at 67–68 n. 318, report that sentencing judges were significantly more inclined to impose death than the juries that recommended sentences to them. The studies also show that the judges' decisions seem to correlate with the race, sex, and social background of the defendant and victim, while the juries showed no evidence of any such biases.

*Louisiana,* 391 U.S. 145, 155, 88 S.Ct. 1444, 1450, 20 L.Ed.2d 491 (1968), and to protect against "arbitrary action" by the compliant, biased, or eccentric judge. *Id.* at 156, 88 S.Ct. at 1451. It "reflects a fundamental decision about the exercise of official power—a reluctance to entrust plenary powers over the life and liberty of the citizens to one judge or to a group of judges." *Ibid.*[8] These concerns are even more compelling where life stands immediately in the balance.

### III.

### The Idaho Constitutional Mandate

The Idaho Constitution, as first approved on July 3, 1890, and as it reads today, provides in Art. 1, § 7:

> "Right to trial by jury.—The right of trial by jury shall remain inviolate...."

That right of trial by jury as it existed at the time our constitution was adopted, provided for jury participation in the capital sentencing process. Section 17 of the Criminal Practice Act of 1864 provided in pertinent part:

> [A]nd the jury before whom any person indicted for murder shall be tried, shall, if they find such person guilty thereof, designate by their verdict, whether it be murder of the first or second degree; but, if such person shall be convicted on confession in open court, the court shall proceed, by examination of witnesses, to determine the degree of the crime, and give sentence accordingly. Every person convicted of murder of the first degree, shall suffer death, and every person

guilty of murder in the second degree is punishable by imprisonment in the territorial prison for a term not less than ten years, and which may be extended to life.

Section 17 was carried over verbatim into Revised Statute § 6563 (1887) enacted two years before the adoption of the Constitution.

In other words, the jury, by determining whether the party was guilty of either first or second degree murder, determined whether or not the death penalty would be imposed.

In *Blue Note, Inc. v. Hopper,* 85 Idaho 152, 157, 377 P.2d 373 (1962), we stated:

> The provisions of the constitution pertaining to the right to trial by jury are construed to apply as it existed at the date of the adoption of the constitution.

*Accord. Anderson v. Whipple,* 71 Idaho 112, 227 P.2d 351 (1951); *Christensen v. Hollingsworth,* 6 Idaho 87, 53 P. 211 (1898); *Comish v. Smith,* 97 Idaho 89, 540 P.2d 274 (1975).

Idaho continued to employ the jury in the capital sentencing process during all of the intervening years until the Supreme Court of the United States struck down the death penalty statutes of most states through its 1972 decision in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

At the time of *Furman,* I.C. § 18–4004 read:

> Punishment for murder.—Every person guilty of murder in the first degree shall suffer death or be punished by imprison-

---

**8.** The *Proffitt* plurality's speculation that "judicial sentencing should lead, if anything, to even greater consistency in the imposition at the trial court level of capital punishment, since a trial judge is more experienced in sentencing than a jury and therefore is better able to impose sentences similar to those imposed in analogous cases," *Proffitt v. Florida,* 428 U.S. 242, 252, 96 S.Ct. 2960, 2966, 49 L.Ed.2d 913 (1976), must, of course, be read in the context in which it was made: as a statement of the probable result of the Florida system in which an advisory jury sentence may be mitigated at the discretion of the trial judge, or increased from life imprisonment to death only where a life sentence would be manifestly unreasonable. *Id.* at 249–50, 96 S.Ct. at 2965–2966. Moreover, empirical evi-

dence suggests that individual state trial judges are not likely to achieve consistency among death sentences meted out across the state. *Gillers, supra,* note 3, at 58–59. *Cook, Public Opinion and Federal Judicial Policy,* 21 Am.J.Poli.Sci. 567, 623 (1977). Rather the state can better take advantage of the purported ability of judges to ensure consistency in capital sentencing, at no cost to the defendant's right to jury sentencing, by relying on the automatic appeal procedure by which this Court must review each death sentence in comparison to other cases involving similar crimes or defendants. I.C. § 19–2827. See, *Gregg v. Georgia,* 428 U.S., at 204–06, 96 S.Ct. at 2939–2940; *id,* at 211–12, 96 S.Ct. at 2942–2943 (White, J., concurring).

ment in the state prison for life, and the jury may decide which punishment shall be inflicted. Every person guilty of murder in the second degree is punishable by imprisonment in the state prison not less than ten years and the imprisonment may extend to life.

In its first post-*Furman* session (1973), the Idaho legislature deleted the jury function from I.C. § 18–4004 and made all convictions of first degree murder subject to the death penalty. This was done in an attempt to remove the "cruel and unusual punishment" aspects disapproved in *Furman*. I.C. § 18–4004 was amended by striking out the words as lined out below:

> 18–4004. PUNISHMENT FOR MURDER.—Every person guilty of murder in the first degree shall suffer death ~~or be punished by imprisonment in the state prison for life, and the jury may decide which punishment shall be inflicted.~~ Every person guilty of murder in the second degree is punishable by imprisonment in the state prison not less than ten years and the imprisonment may extend to life.

The 1973 Amendment restored the law to its 1864 standing.

After the United States Supreme Court in a series of cases declared statutes of other states which were similar to Idaho's 1973 version unconstitutional, the Idaho legislature responded in 1977 with the present statutory scheme providing for inquiry into mitigating or aggravating circumstances as set forth in I.C. § 19–2515 et seq. That amendment changed the statute back to its pre–1973 language except that it omitted restoring the jury function and added the reference to I.C. § 19–2515:

> 18–4004. PUNISHMENT FOR MURDER. ~~Every~~ Subject to the provisions of 19–2515, Idaho Code, every person guilty of murder ~~in~~ of the first degree shall ~~suffer~~ be punished by death or by imprisonment for life. Every person guilty of murder ~~in~~ of the second degree is punishable by imprisonment ~~in the state prison~~ not less than ten (10) years and the imprisonment may extend to life.

Except for four states which entirely abolished capital punishment in the nineteenth century, every American jurisdiction has at least at some time employed jury sentencing in capital cases. *McGautha v. California*, 402 U.S. 183, 200 n. 11, 91 S.Ct. 1454, 1463 n. 11, 28 L.Ed.2d 711 (1971). During a period of over a century, beginning in 1838, jurisdiction after jurisdiction that retained the death penalty replaced its mandatory capital punishment law with discretionary jury sentencing, *Woodson v. North Carolina*, 428 U.S. 280, 291–92, 96 S.Ct. 2978, 2985, 49 L.Ed.2d 944 (1976) (plurality opinion). By the time of the Furman decision in 1972, Colorado was the only state in the nation to impose capital punishment without jury involvement in the sentencing process.

Despite the long history at common law and under statutory law of the states throughout this nation of involving jury in the capital sentencing process, the Idaho legislature in the present statute enacted in 1977 totally excluded the jury from its traditional function. The legislative history shows that the legislature was not even presented with a bill which provided for jury participation. The only bill presented, was one drafted by the attorney general, Senate Bill 1082, which was presented to the legislature with the following statement of purpose:

RS 1954

S 1082

STATEMENT OF PURPOSE

Only a few years ago, the United States Supreme court made new "rules" concerning the imposition of the death penalty for serious crimes. So that we conformed with this U.S. Supreme Court interpretation of the federal Constitution, the Idaho Legislature enacted in 1973 our present death penalty Section 18–4003 and 18–4004, Idaho Code.

Then, last year, the United States Supreme court again changed the rules relating to capital punishment—after many states, like Idaho, had acted in response to its previous decision. The Court, in

five cases, set forth new, more definitive rules concerning sentencing where the death penalty was sought to be imposed. *The purpose of this bill is to codify into Idaho law these present requirements imposed on the states by these most recent United States Supreme Court decisions* on capital punishment so that we will conform with this latest expression of the law. (Emphasis supplied.) The statement of purpose is misleading insofar as it suggests that the Supreme Court decisions mandated the removal of the jury from its traditional powers and functions; the United States Supreme court never at an earlier time or in this "latest expression of the law" required jury non-involvement.

Since jury participation in the capital sentencing process is part of the right to "trial by jury" as guaranteed inviolate by Art. 1, § 7 of the Idaho Constitution, I would reverse and remand for proper sentencing and would urge the legislature to amend the statutes to provide for proper jury participation in order that future capital punishment cases will not be subject to this serious defect.

### IV.

#### Interim Solution by District Judges

Since this Court has not seen fit to bring the Idaho sentencing process into a constitutional posture, and since the current session of the Idaho Legislature has not even formally taken up the effect of *Adamson*, we are undoubtably going to be faced with a year or more of uncertainty while we await the review of *Adamson* by the United States Supreme Court on Certiorari. Should the 9th Circuit be affirmed, then all death sentence cases in Idaho which have been imposed in that interim period will have to be reversed and remanded for resentencing, if not a total new trial. I believe there is a method whereby our Idaho district judges, exercising their intelligence and their plenary power, can bring order to this chaos and validly complete capital cases. It has always been the law of Idaho that district judges have the power to call for advisory juries in cases where juries are not mandated by statute or common law. Our district judges could, on their own motion, adopt the procedures of the thirty-one other states by bifurcating the trial and bringing the jury in as an advisory jury at the sentencing phase. So that the jury would be fully apprised of the seriousness of its undertaking, the district judge would inform the jury that he would not impose the death penalty unless they so recommended. The district judge would, of course, retain his traditional power under Idaho law to impose a sentence less than death if he deemed such reduction appropriate. By engaging in this procedure, a district judge would not only be doing a service to the taxpayers by way of judicial economy in obviating the need for retrials or resentencing, but additionally the court would be properly serving both society and the defendant by protecting the constitutional right to trial by jury.

JOHNSON, Justice, concurring, concurring specially, and dissenting.

I concur with the majority opinion with regard to parts I (The Preliminary Hearing), III (Transcript of Fain's Statement), IV (Fain's Polygraph Test), and VII (The Post–Conviction Order). I concur with part II (Admission of Cellmates' Testimony), so far as it relates to the testimony of Ricky Lee Chilton and to the refusal to require Bobby Roberson to submit to a psychiatric examination or to take a polygraph test. I concur with part VI (The Death Penalty), so far as it relates to the right to jury sentencing, to proportionality, and to the weighing of aggravating and mitigating circumstances. I concur specially with part VI, so far as it relates to the lack of overlap of I.C. § 19–2515(g)(5) and (6). I dissent with regard to part II, so far as it relates to the testimony of Bobby Roberson and to part V (The Destroyed Swabs).

#### THE OVERLAP OF I.C. § 19–2515(G)(5) AND (6)

I concur specially with that portion of part VI of the majority opinion, so far as it relates to the lack of overlap of I.C. § 19–2515(g)(5) and (6). In my view there

is some overlap between these two aggravating circumstances, but this overlap does not cause any problem, so long as the mitigating circumstances are weighed against each aggravating circumstances found, individually. *State v. Charboneau*, 116 Idaho 129, 774 P.2d 299 (1989).

Any overlap does not prejudice the defendant, since whatever element is included in I.C. § 19–2515(g)(5) that is also included in I.C. § 19–2515(g)(6) is weighed only once when each of these circumstances is weighed against all the mitigating circumstances. Only if the mitigating circumstances were weighed against all of the aggravating circumstances, collectively, would the overlap cause a problem. In that case the element that was overlapped would, in effect, have been included twice on the aggravating side. In my view, this would be impermissible.

## ADMISSION OF THE TESTIMONY OF BOBBY ROBERSON

Because this is a death penalty case, we should apply special care in determining whether Fain's rights have been violated. *Cf., State v. Scroggins*, 110 Idaho 380, 387, 716 P.2d 1152, 1159 (1985) (This Court must review a death sentence in a manner "qualitatively different than our review of an ordinary criminal sentence."); *Thompson v. Oklahoma*, 487 U.S. 815, 108 S.Ct. 2687, 2710, 101 L.Ed.2d 702 (1988) (Justice O'Connor stated that "the death penalty has been treated differently from all other punishments.") In my view the admission of the testimony of Bobby Roberson about what Fain told him after he was returned to Fain's cell following an interview with a detective violated Fain's rights under the sixth amendment to the United States Constitution and art. 1, § 13 of the Idaho Constitution.

In reaching my conclusion on this aspect of the case I have been guided by the decision of our Court of Appeals in *State v. Currington*, 113 Idaho 538, 746 P.2d 997 (App.1987), *rev. den.* (1988). Because we denied review in *Currington*, I believe it is now binding on this Court as controlling precedent.

The following facts concerning Roberson's testimony appear in the record of this case:

1. Roberson was transferred by the jailer from cell P–3 to Fain's cell. (Tr., p. 756.)

2. Approximately an hour and one-half after Roberson was put in the cell with Fain, Fain came to Roberson and said, "I suppose you might want to know the reason I'm in the cell." Fain then explained to Roberson the reason he was there. (Tr., p. 726.)

3. Fain and another person in the cell were having conversation about sexual conduct with little girls. (Tr., p. 726.)

4. Roberson told the director of detention of the Canyon County jail that he wanted to see a detective. He said he had information concerning what Fain had been telling the inmates in the next cell concerning his actions in a crime. (Tr., pp. 757–58.)

5. The director of detention acted upon Roberson's request by getting him to see Detective Hensen. Hensen was in charge of criminal investigation for the Canyon County Sheriff's office. (Tr., pp. 759–61.)

6. The director of detention was aware that Fain was represented by counsel. (Tr., p. 762.)

7. Hensen was engaged in the investigation regarding the disappearance and death of Daralyn Johnson and had testified at Fain's preliminary hearing approximately three weeks earlier. (Tr. of Preliminary Hearing, pp. 164–85.)

8. Roberson informed Hensen of Fain's conversation with another inmate about having sex with young girls. (Tr., p. 727.)

9. Roberson told Hensen he would stay in the cell with Fain and see if he could help on the case. Hensen told Roberson that it would be of no value because of legal problems it would encounter and that Hensen did not care to discuss it with Roberson. Hensen did not want Roberson "to become an

**111**

agent for the Canyon County Sheriff's office." (Tr., pp. 710, 721.)

10. Hensen told Roberson he would try and see if he could get Roberson moved from Fain's cell, but that it might take a day to a day and one-half, or even longer. Hensen told Roberson he would do his best to see if he could get Roberson transferred. (Tr., p. 727.)

11. When Roberson left Hensen's office, Hensen assumed that Roberson was going back to Fain's cell. Hensen assured Roberson that he would get hold of the jail supervisor and see if he could assist in getting Roberson moved out. (Tr., pp. 717–18.)

12. Hensen knew that Fain was represented by counsel. Hensen did not attempt to contact Fain's attorney with regard to his conversation with Roberson. On the same day as the conversation with Roberson, Hensen did advise the prosecuting attorney's office of what Roberson had told him. (Tr., p. 718.)

13. Neither Hensen nor anyone else to his knowledge advised Fain that Roberson was in his cell obtaining information and providing it to Hensen. (Tr., p. 719.)

14. Hensen felt that some of the statements that Fain had made in Roberson's presence incriminated Fain. (Tr., pp. 723–34.)

15. Roberson remained in the cell for another night after he talked to Hensen. (Tr., p. 762.) Roberson recalls that it was approximately a day to a day and one-half before he was transferred out of Fain's cell. (Tr., p. 727.)

16. While Roberson was in the cell with Fain, after Roberson had been to talk to Hensen, Fain came over and started talking again about the young girls, what he would do, and how it felt. Fain then began talking about picking up Daralyn Johnson and revealed to Roberson what he had done to her. (Tr., pp. 781–85.)

17. Roberson obtained two maps that Fain had drawn depicting where he had picked up Daralyn Johnson and where he had taken her. (State's Exhibit No. 43; Tr., p. 784.) Fain drew the maps after he told Roberson what he had done with the girl. Fain wadded the maps up in his hands and put them in the toilet. Roberson went over and sat on the stool, and when Fain walked away, Roberson picked the maps up out of the toilet and put them in his pants so that Fain couldn't see them. (Tr., pp. 736–37.)

18. Roberson asked the jailer if he could have paper and some pencils. (Tr., pp. 737–38.) Roberson used the paper and pencils to write notes of the information that he had obtained from Fain. (Tr., p. 736.)

19. After Roberson was transferred from Fain's cell, he had another conversation with Hensen in which he told Hensen what Fain had told him about what he had done with Daralyn Johnson. (Tr., p. 711.) Roberson also delivered to Hensen the maps that Fain had drawn. (Tr., p. 737.)

These facts distinguish this case from those cited in the majority opinion.

In *Currington* the Court of Appeals held that the State impermissibly took advantage of circumstances and violated the defendant's sixth amendment right to counsel through an informant's conversation with and recording of the conversation with the defendant who was free on bail. The Court of Appeals reviewed extensively the recent history of the right to assistance of counsel in the context of the testimony of informants about admissions made by defendants charged with the crime. The court invoked both the sixth amendment to the United States Constitution and art. 1, § 13 of the Idaho Constitution. After discussing *Massiah* and *Henry*, cited by the majority here, the Court of Appeals discussed *Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985). There, a co-defendant approached state authorities because he had received anonymous threats. The police provided him with a telephone recording device and instructed him to record any threats or conversations had with the defendant. After

recordings were made and reviewed by the police, the police attached a "body-wire" to the informant in advance of a meeting between the informant and the defendant to discuss their defense. At this meeting, which was scheduled by the defendant, the defendant made incriminating statements. The Supreme Court held that the sixth and fourteenth amendments barred admission of the statements with respect to pending, charged crimes.

In reviewing the Supreme Court's decision in Moulton, the Court of Appeals in *Currington* focused on that part of the Supreme Court's opinion indicating that the state took advantage of the circumstances in obtaining the incriminating statements. The Court of Appeals quoted the following passage from *Moulton:*

> The Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a 'medium' between him and the State. As noted above, this guarantee includes the State's affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking this right. The determination whether particular action by state agents violates the accused's right to the assistance of counsel must be made in light of this obligation. Thus, the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached. [Citation omitted.] *However, knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity.* Accordingly, the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent.

113 Idaho at 542–43, 746 P.2d at 1001–02, *quoting Moulton,* 474 U.S. at 176, 106 S.Ct. at 487 (emphasis added in *Currington).*

After discussing *Kuhlmann,* cited by the majority, the Court of Appeals stated that "as illustrated by *Henry* and *Moulton,* the Sixth Amendment may apply, although the defendant initiated the conversation, if the state exploited a relationship or a set of circumstances where incriminating statements were likely to be made." *Id.,* 113 Idaho at 544, 746 P.2d at 1003.

I have read with interest the case of *United States v. Yeager,* 428 F.2d 182 (3rd Cir.1970). This case is the most factually similar case to the present case that I have seen. In *Yeager* the inmate who testified against the defendant had originally been placed in an adjoining cell. He had almost daily conversations with the defendant for a period of two months. He was then sent to a diagnostic center, apparently because of an emotional problem. At the center he was interviewed by two detectives investigating the defendant's case. Eventually he told the detectives what he had learned from the defendant. No promises were made by the detectives in return for this information. The detectives asked him to keep them informed of any further conversations. When he returned to the jail he was placed in a cell with the defendant, and he talked with the defendant with a view toward getting information for the prosecution. Later, the prosecutor agreed that if he would testify against the defendant, he would be allowed to serve a previously imposed two to four-year sentence in a prison other than Trenton, where the defendant had numerous friends. The trial court ruled that any statements made by the defendant to the informant after his return from the diagnostic center were inadmissible, because after the interview the prosecution had placed the informant in the cell with the defendant, and the informant had questioned the defendant for the purpose of giving information to the prosecutor. The trial court did allow the informant to testify about inculpatory statements made by the defendant prior to the informant's interview with the detectives in the diagnostic center.

While there are some distinctions with regard to the testimony of the informant in *Yeager,* and *Roberson* in this case, I am inclined to the view that those distinctions are not sufficient enough to dictate a different result here. None of the evidence Roberson obtained after his return to Fain's cell following his interview with Hensen should have been admitted.

## THE MISSING SWABS

While I agree with much of the majority's analysis concerning the missing swabs, I cannot concur that the state did not deprive Fain of due process by failing to preserve them. In my view, the jury should have been instructed as requested by Fain. Fain's requested instruction read as follows:

> If you find from the evidence before you that the state or any agent of the state allowed material evidence to be destroyed, then you may infer that such evidence would have been against the interests of the state in seeking conviction.

This instruction was based on *State v. Willits,* 96 Ariz. 184, 393 P.2d 274 (1964) and *State v. Hunter,* 136 Ariz. 45, 664 P.2d 195 (1983). It focuses on evidence that the state has allowed to be destroyed. It fits the circumstances in this case and would leave to the jury the question of whether the state allowed the evidence to be destroyed and, if so, whether the missing evidence would affect the verdict of the jury.

BISTLINE, Justice, concurring in part, dissenting in part.

On the motion of defense counsel my involvement on this aged appeal commenced in December of 1987. Prior to that I had no connection with the case. The Court having brought me into the case, I became acquainted with prior proceedings by reading briefs, listening to taped argument, examining the record, and then sat with the Court at a second oral argument in February 1988, three years after the first oral argument was presented. Justice Huntley's prefatory remarks explain the delay. I am not sufficiently informed as to the suspension of the appeal other than by the statement that it was "to enable a post-conviction proceeding to take place" and also for the additional briefing on the direct appeal by the defendant and, of course, the mandatory review. I am aware that the legislature or the Supreme Court, or both acting in concert, have purposefully slowed down the processing of a capital defendant's direct appeal and statutory review on the basis of alleged efficiency. In one of the earlier death penalty cases I expressed the view that death penalty appeals and reviews should not be delayed, and that inexorably protracted and inexcusable delay could be to the death row inmate a form of cruel and inhumane punishment. *State v. Osborn,* 104 Idaho 809, 821, 663 P.2d 1111 (1983). Such a defendant cannot be heard to complain of delay attributable to him, but unjustified state delay (even including the judicial department) is of a different ilk.

Justice Huntley has presented his views in this case in Parts I through VII. My views will be set forth in that same order.

## I

Evidence received at the preliminary hearing need not be exhaustive. In Idaho it seldom is because all that is needed is sufficient proof a crime having been committed—beyond dispute in this case—and probable cause that the accused was the perpetrator. *State v. Villarreal,* 94 Idaho 246, 486 P.2d 257 (1971), and *State v. Elisondo,* 114 Idaho 412, 757 P.2d 675 (1988). The evidence was sufficient to justify the magistrate in holding Fain to stand trial. I concur with Justice Huntley in Part I.

## II A THE ROBERSON TESTIMONY

Justice Huntley's opinion does not tell why and how Roberson came to be in jail, and that information may not be available in this record. The Roberson testimony on its face gives little appearance of credibility. It may be noted that I have concurred in Justice Johnson's opinion regarding the admissibility of the testimony of Bobby Roberson. A defendant jailed on a charge of

first degree murder and facing the death penalty is said to have volunteered to a stranger that he has indeed killed a child. Such is for certain far out of the normal. Justice Huntley does not, nor do any of the Court members who form a majority upholding the conviction, suggest that it is credible testimony. What the majority holds on that issue is based on this slender reed: Because the trial judge denied the suppression motion the majority infers that the judge found the testimony credible. This is supposed to follow from a preceding sentence which states: The judge denied the suppression motion because the judge believed Roberson's account of the circumstances under which defendant Fain spoke to Roberson in his cell. A California case is cited for the proposition that a witness's credibility is a question of fact to proposition that a witness's credibility is a question of fact be determined by the court in the context of a suppression hearing. I have read the case. As to what that case is about and what bearing it has on the case before us, I do not care to comment, other than to say its holding is of passing interest and might be utilized in an appropriate circumstance.

In my view credulity is severely stretched to so readily accept as the majority does, that a defendant jailed on a charge of first degree murder and facing the death penalty is said to have volunteered to a stranger that he has indeed killed a child. Such is certainly out of the normal. Of course, anything is possible, even though highly improbable. But, for the reasons, and on the factual analysis made by Justice Johnson, the testimony of Roberson was definitely subject to the scrutiny of the *Massiah* rule which this Court first applied in the *LePage* case. Another valid objection to the use of Roberson's testimony was the failure of the prosecutor, in the first instance, and the trial judge in the second, to allow psychological and/or psychiatric testing and evaluation of Roberson. The majority opinion confuses credibility with competency. Credibility is a determination to be made by a jury. The competency of a witness is subject to challenge, I.C. § 9–202(1), and it is that determination

which is for the court upon hearing the testimony of witnesses, including experts. 81 Am.Jur.2d, Witnesses, § 80 et seq; 148 A.L.R. 1140; *McNeely v. State*, 169 Ind. App. 461, 349 N.E.2d 204 (1976); *People v. Reber*, 177 Cal.App.3d 523, 223 Cal.Rptr. 139 (1986). "When the competence of a witness to testify is challenged by timely objection it is the duty of the trial court to schedule a hearing in order to make a proper determination upon all the facts and evidence as to whether the witness is or is not competent to testify." *McNeely, supra*, 349 N.E.2d at 207. In the instant case the trial court refused to make any inquiry, notwithstanding the presentation of a prima facie case attacking Roberson's competency. This facet of the trial was brought to our attention in Fain's opening appellate brief:

VII. THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN HE REFUSED TO PERMIT THE DEFENSE TO SUBJECT A CRUCIAL STATE WITNESS TO A PSYCHIATRIC AND/OR POLYGRAPH EXAMINATION.

The evidence against this defendant, but for the testimony of highly suspect cell-mates, was totally circumstantial. Thus, the testimony of the cell-mates became extremely critical, for it was a matter of pitting their word against that of the defendant. The testimony of Roberson was especially critical, and because of his background of mental problems, the defense requested that he be evaluated psychiatrically in order to determine his stability as a witness. Even though there are cases making it clear that the trial court has great discretion in permitting such examinations in order to permit the jury to have a full picture as to credibility, the trial court here exercised no discretion at all. He stated 'it's certainly not my intent to wander into the never-never land of having witnesses evaluated by a psychiatrist before they are even presented to the Court—never.' (Tr. Motions 26) To refuse to exercise discretion is not to act with discretion;

by his refusal to even consider the request the trial judge abused that discretion given him. And, with all due respect, the 'never-never land' referred to by the trial judge has been wandered into by some very respectable courts. In fact, in the case of *State v. Landis Dillard*, a case very familiar to this Court, Judge Doolittle himself wandered into the "never-never land" and permitted a psychologist to present his views as to the dual personality of the defendant. In view of such conflicting decisions coming from the same trial judge, the defendant wonders whether equal protection has any real meaning?

It has been recognized that:

"The psychologically abnormal witness can present a serious obstacle to fact finding in the judicial process. Almost any emotional or mental defect may materially affect the accuracy of testimony; a conservative list of such defects would have to include the psychosis, most or all of the neurosis, defects in the structure of the nervous system, mental deficiency, alcoholism, drug addiction, and psychopathic personality." Juliver, "Psychiatric Opinions as to Credibility of Witnesses: A Suggested Approach", 48 Cal.L.Rev. 648 (1960).

The witness Bobby Roberson certainly fits within the description set forth.

Roberson was the defendant's cell mate during pre-trial incarceration. He was the step-son of a member of the Canyon County jail staff. The devastating effect of Roberson's testimony as to the defendant's detailed description of the kidnapping, sexual molestation, and killing of Daralyn Johnson is obvious. How reliable was the testimony:

As pointed out in the defendant's affidavit in support of the motion to compel psychiatric examination, in 1979, a psychiatrist had evaluated Bobby Roberson and in March of 1983 the New Mexico Probation and Parole Division made a report on Roberson's progress. The psychiatrist described Roberson as a manipulative person who seeks "in a rather dramatic way of placing himself on center stage" and who has "faked" situations to achieve personal satisfaction. The New Mexico report indicates that Roberson has "encountered many serious behavioral problems in 'working' with staff" and that he "appears to be an extremely volatile and manipulative person". Both the psychiatrist's evaluation and the New Mexico report note Roberson's memory-lapse problem and his inability to recall events for which he was incarcerated. The psychiatrist's report also notes that when pushed, Roberson admitted that he could remember more than he stated at times. Roberson had a history of behavioral problems, manipulativeness, and desire for center stage. Given this background, his involvement in this case was very suspicious. He sought out a detective to inform him of the defendant's jailhouse conversations—conversations which were completely innocent to that point. After speaking to the detective and returning to his cell, Roberson was suddenly (within one day) allegedly privy to a full, complete, and very detailed confession by the defendant during which the defendant even allegedly drew Roberson a map to detail the route of abduction. (Tr. 830)

To maintain validity as truth-seeking bodies, courts must integrate mode in scientific methods for evaluating a person's capacity to tell the truth. A psychiatric evaluation can often help bring the truth to light, and courts are beginning to recognize the value of such evaluations. *State v. Armstrong*, 232 N.C. 727, 62 S.E.2d 50 (1950).

Because psychiatric evaluation is relatively new in the law, cases on the subject are not plentiful. However, certain concepts are clear. Even if a person is found competent to testify at trial, he is still subject to an attack on his credibility based upon his mental state or capacity. *People v. Schuemann* [190 Colo. 474], 548 P.2d 911, 913 (1976). The value of this rule was pointed out by a commentator who stated that, 'Actually, the psychopathic liar may be so convincing that he may pass the test of competency with

flying colors.' Conrad, 'Psychiatric Lie Detection', 21 F.R.D. 199 (1957). In the present case, Roberson was probably competent to testify but his credibility was very doubtful.

The types of mental problems which will constitute an attack on credibility, and thus be relevant, have varied in the decisions. In one case, a chief witness had been involved in an incident in which he ran around the city naked. The court excluded psychiatric evidence regarding the incident because not enough facts were alleged to show that the witness might suffer from 'some mental aberration rendering his observation and memory of [the events] unreliable'. *Bakken v. State*, 489 P.2d 120, 124 [Alaska 1971]. The witness's capacity to remember is a universally accepted method of attacking credibility. The psychiatric evaluation and probation report done on Roberson specifically and particularly addressed his lapse in memory and inability to recall the events of the crimes he committed.

The defendant urges this Court to follow the approach of allowing an attack on the witness' mental condition to show not only poor memory or perception but also to show that defendant has a motivation reason, tendency or predisposition to lie. The rationale for this approach seems clear:

> Lie detection is still an aboriginal state. The liar, be he a conscious or unconscious one, be he a normal person or be he a psychopathic liar, is as dangerous to our society as a murderer. No one method of lie detection is adequate. Many individuals still believe that a liar may be detected by the act of wiping his hands during the course of his testimony. Such lay rules of thumb offer few possibilities in lie detection. Conrad, Psychiatric Lie Detection, 21 F.R.D. 199 (1957).

The defendant urges this Court to follow the approach taken In *State v. Zuck*, [134 Ariz. 509], 658 P.2d 162 (1982), and direct that evidence as to mental condition as it may effect credibility or capacity to observe, remember, understand, or comprehend.

The defendant urges that especially in a case in which the defendant is being convicted almost entirely on the testimony of one person. That person's mental condition should be a major, not collateral, issue in the case. *People v. Schuemann, supra* [548 P.2d], at 914. In *Schuemann*, testimony of a psychiatrist was excluded because the trial court felt that mental disabilities defy precise definition and evaluation and because another psychiatrist's testimony was in conflict and the jury might be confused and distracted. The court, in reversing, said that wide latitude should be granted to the defense to attack the witness in a case which turns on the testimony of one person.

In the case of *State v. Allen*, 70 N.J. 474, 361 A.2d 5 (1976), the defendant was charged with armed robbery and murder. His key defense witness was a juvenile who was prepared to present alibi testimony. The juvenile had been at the state home for girls and was on parole. She had had psychiatric exams while at the home and had at times suffered from psychiatric delusions. The state moved to review her records and to require a psychiatric examination prior to her testifying. The court determined that the prosecution should be permitted to examine the confidential records and utilize them on cross examination, if warranted, and to use them in applying for a court ordered examination. The New Jersey Court was interested, not in traditional key-note type responses, to the problems of credibility, but in helping the finders of the fact get the best possible look at the credibility of key witnesses in a criminal trial. The New Jersey court reached the same conclusion in *State v. Butler*, 27 N.J. 560, 143 A.2d 530 (1958). See also, in support of the defendant's contention that the trial court should have held a hearing on Roberson's credibility and the question of whether a psychiatric examination was needed, *People v. Keelin* [39 Colo.App. 124], 565 P.2d 957 (Colo.App.1977); *McNeely v. State* [169

Ind.App. 461], 349 N.E.2d 204 (Ind.App. 1976); *Mangrum v. State* [227 Ark. 381], 299 S.W.2d 80 (Ark.S.Ct.1957); and *Taborsky v. State* [142 Conn. 619], 116 A.2d 433 (Conn.Sup.Ct.1955).

With the glowing problems in the background of Roberson relating to his ability to tell the truth, and his propensity to manipulate facts to his own benefit, the trial Court should have permitted an examination of the witness. The defendant's life was on the line at the trial, and the trial judge did nothing to assure that the jury had all the information before it relevant to the question of whether the witnesses were telling the truth. The jury is the absolute judge of the matter of credibility of witnesses, and is so told in the instructions. Why the reluctance on the part of the trial judge to let the jury, then, have all the relevant information in order to make that most important of all decisions. The failure of the trial judge to trust the ability of the jury to assess the relevant information as to the witness's credibility amounted to an abuse of discretion which contributed to the defendant's facing of death.

Appellant's Brief, pp. 46–51.

While a prosecutor's obligation to his office and to the people is to do just that which the title implies—prosecute—at the same time an obligation also remains on him to be fair in his search for the truth and his endeavor to bring no witnesses to testify to a jury who are in any way unreliable. A good and fair prosecutor in my book is one who will not place a witness of doubtful qualifications on the stand without first using all available methods of ascertaining that his testimony will not be conjured fantasy. Here the prosecutor, not to his credit, was willing to have the jury hear the testimony of Roberson no matter what his problems were. Such conduct would certainly go far in gaining a conviction, but a prosecutor should always want to well satisfy himself that a tendered witness is a "valid witness." When the prosecutor fails to do that, then the Court should do it. This would be especially true where, as here, defense counsel has been able to provide the trial court with evidence which puts a witness, here Roberson, in any extremely suspect light.

If the witness is nevertheless going to be allowed to testify, defense counsel certainly should have the right to present to the jury any expert testimony on the witness's personality, powers of recollection, and all else that would shed light in the credibility of any witness. On the basis of having been persuaded to accept the authority set forth above in the defendant's brief, I am fortified in having joined Justice Johnson. When one examines a recent case in point from California, which in turn relies upon a recent holding from the Supreme Court of the United States, Justice Johnson and I are both fortified to what I think would be an overwhelming extent:

Defendants rely principally on *Davis v. Alaska* (1974) 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347, to support their claim that the challenged discovery and evidentiary rulings effectively denied them their Sixth Amendment confrontation rights. In *Davis*, the prosecution obtained a protective order preventing the defense from cross-examining the key prosecution witness concerning his probation status. The order was based on an Alaska statute protecting the anonymity of juvenile offenders. Reversing the conviction, the United States Supreme Court held that the right of confrontation was paramount to the state's policy of protecting anonymity of the juvenile offender. Whatever temporary embarrassment might result to the witness and his family by disclosure of his juvenile record was outweighed by the defendant's 'right to probe into the influence of possible bias in the testimony of a crucial identification witness.' (*Id.*, 415 U.S. at p. 319, 94 S.Ct. at [p. 1112], 39 L.Ed.2d at p. 355.) The high court reasoned that the Sixth Amendment guarantee that an accused in a criminal prosecution "be confronted with the witnesses against him" means more than confronting the witnesses physically. The primary right secured by confrontation is cross-examination. (*Id.*, 415 U.S. at p. 315, 94 S.Ct. at p. 1110, 39 L.Ed.2d at p.

353.) 'Cross examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit the witness.' (*Id.*, 415 U.S. at p. 316, 94 S.Ct. at p. 1110, 39 L.Ed.2d at p. 353.) 'While counsel was permitted to ask the witness whether he was biased, counsel was unable to make a record from which to argue why the witness might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial.' (*Id.*, 415 U.S. at p. 318, 94 S.Ct. at p. 1110, 39 L.Ed.2d at p. 355; emphasis in original.)

*People v. Reber*, 177 Cal.App.3d at 529, 223 Cal.Rptr. at 144.

The trial judge's decision to let Roberson testify under the circumstances here presented, as well detailed in the excerpt from defendant's brief is absolutely frightening. But worse is an appellate court decision which upholds that ruling, and in doing so establishes precedential case law binding in all future trials where cell mate testimony is offered.

This defendant may be guilty, true, but every man and woman in Idaho must now realize that they can be tried and convicted on testimony of a tainted cell mate, which is wrong, but worse yet when that inmate's mental balance has been recently held highly doubtful by other authority, but in Idaho will not become the subject of any inquiry whatever. It is indeed a violation of the right of confrontation, as per *Davis*.

## II B THE CHILTON TESTIMONY

It would seem that if Chilton's attorney, and thus Chilton's agent and spokesperson, passed on to the prosecutor the remarks which Chilton allegedly had heard Fain say, then it has to be assumed that the attorney believed himself authorized to do so, and also thought that it was in Chilton's best interest. The only way that this could benefit Chilton would be the expectation of an ultimate reward at the hands of the prosecutor for his volunteered "cooperation" with authorities by furnishing testimony at trial.

Thus, at the outset, there is little distinction between Roberson's direct contact with the prosecutor as compared to Chilton's vicarious contact through his attorney, after which Chilton stated that he was then visited (presumably) in his jail cell and asked to give up possession of excerpts from his journal which he kept. Thereafter Chilton "filed a formal statement" (where is not explained nor can I find an answer by examining the appeal record) "asserting that the prosecutor's office had conspired to force him into testifying, ..." and that "Chilton continues to assert that the alleged death threats against him were, in fact, made by officials in the Canyon County Prosecutor's Office."

It surprises me that the entire Court does not find these underlying circumstances relating to Chilton's testimony very disturbing, extremely so. One point which I think is worth adding is that at the suppression hearing held before Chilton was allowed to testify to the jury, the court asked Chilton if he would say that no one ever offered him any money, leniency, or anything to get into Fain's cell and get information and turn it over to the state. Chilton's answer was that no one ever said anything like that at all. The question which the court did not ask him, however, was whether he expected any such favors. The whole scenario suggests that he did—otherwise it makes no sense. There is no problem whatever in believing that Chilton was cunning enough not to directly ask for and that the officers for certain knew better than to volunteer any such offers or promises.

There is a large problem in understanding how the prosecutor, without calling himself as a state's witness, could make this testimonial statement to the court:

MR. HARRIS: The only other thing I can say, Your Honor, is that as far as I

know, in talking to Mr. Chilton, the statements that were given to him, or made to him that will be used in his testimony, were made voluntarily, not the subject of any interrogation of any kind on his part, but were spontaneous and voluntary remarks made by the defendant to Chilton himself in this case, or within his hearing. Actually, let's put it that way, within his hearing. Not made directly to him, but within his hearing.

Tr., Vol. IV, p. 843. Adding to that concern is the prosecutor's quickness in correcting himself where, after speaking of Fain's "spontaneous and voluntary remarks made by the defendant to Chilton himself ..." he added, "or within his hearing. Actually let's put it that way, within his hearing. Not made directly to him, but within his hearing." Tr., Vol. IV, p. 843.

After the court ruled that Chilton could testify, the prosecutor interrogated both as to Fain–Chilton conversations and an overheard conversation between Fain and a Ray Beam who had apparently been introduced into the cell which was first occupied by Fain alone when Chilton was put into it. Chilton gave testimony which if believable, and believed, would have justified any jury in finding defendant guilty.

On cross-examination, however, Chilton was questioned by defense counsel. He gave some testimony which was more than of passing interest:

Q By Mr. Bishop: Have you ever stated that the prosecutor's office has conspired to kill you?

A [Chilton] Yes, I have.

Q When did you say that?

A I said it in court in my—

Q What—which court?

A Magistrate Court.

MR. HARRIS: Well, I am going to object as being irrelevant, immaterial, and not within the issues—

COURT: I don't quite see the relevancy of this—

MR. HARRIS: —of any issue in this case, Your Honor.

MR. BISHOP: Well, it goes to the credibility of the witness, I think.

COURT: Very well, I'll—I'll permit it.

Q Which court did you state that in?

A It was in magistrate court, my arraignment for cases C–5569 and 5568.

Q Were you represented by counsel at that time?

A No, I was not.

Q Was there truth to those allegations?

A Yes, there is.

Q Was that made in response to this testimony here today?

A No, it's not.

MR. BISHOP: I have no further questions, Your Honor.

Tr., Vol. IV, p. 854–55. The prosecutor, notwithstanding his objection to that sworn testimony, then took the witness briefly for the purpose of having Chilton further vouch for the verity of his testimony:

BY MR. HARRIS: Q Mr. Chilton, is the testimony that you have given here today true and correct to the best of your knowledge and belief?

A Yes, it is.

MR. HARRIS: I don't believe I have anything further, Your Honor.

MR. BISHOP: I have nothing.

COURT: You may step down, sir.

Tr., Vol. IV., p. 855.

Two days later a deputy prosecutor was allowed to return Chilton to the stand to testify that on the charges against him there was no plea bargain arrangement entered into in exchange for his testimony against Fain, Tr., Vol VI, p. 1278, at which time Chilton mentioned having a letter to him from the prosecutor which he read: "It is my feeling that Ricky should cooperate with us of his own violation [sic], volition as a demonstration of good will." *Id.*, at 1279.

Intimidation of a witness in a criminal case is a felony in Idaho. With the prosecutor in essence having endorsed Chilton's trial testimony, and that testimony including the statement that he, Chilton, was coerced and forced into testifying for the prosecutor, it was rather hollow for Chilton to say as he did when called back that his testimony at trial was offered freely and voluntarily.

In these many years in this profession, I have never before seen the equal of these circumstances, and would hope to never see them again. Where a witness has testified to being intimidated into testifying by state officers, there is no way to rehabilitate him as to make him a palatable witness in a jury trial. From reading and rereading of his testimony Chilton comes across as a person who would and did say anything—and nothing in the record refutes his sworn testimony that he was intimidated by the authorities in a manner made felonious by law.

I cannot in good conscience concur in Part II of Justice Huntley's opinion dealing with the use of Chilton's testimony which I would characterize as an insult to the criminal justice system.

The philosophical question presented to us, as worded long ago by Justice Frankfurter, is whether the government's conduct in this case was such as to "offend those canons of decency and fairness which express the notions of justice of English-speaking Peoples," to "shock the conscience," and to "offend a sense of justice." *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). Twenty-one years later the Supreme Court of the United States in an entrapment case in a drug context, *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), citing to *Rochin* warned that:

> ... we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.... 411 U.S. at 431–432, 93 S.Ct. at 1643.

A five-justice majority went on to add that Russell would not be so fortunate. But a reputable four-justice minority (Justices Douglas, Brennan, Stewart, and Marshall) disagreed in two strong dissenting opinions.

### III

Without citation to any case precedent, the majority rules that there was no error on the part of the trial court in not allowing the jury to have the tapes, and also a transcript of the tapes. Neatly finessing a rather sticky issue, the majority provides the trial bench and bar with the pontifical pronouncement that "limited, relevant portions would have been admissible under the then existing Idaho evidentiary practice, which practice is now articulated in Idaho Rule of Evidence 106." Rule 106 is then set out following which is conceded that the State did not introduce a writing (which, or a recorded statement, is the subject matter of Rule 106).

Grossly putting the blame for the non-admission of the tape and transcript on the public defender, the majority indulge in a bit of sophistry, which, while it reads nicely, is simply an unsupported statement: "... since Fain's counsel failed to tailor his request in any respect so as to move for the admission of only those other parts of his statement which might be relevant to the context of Officer Newton's testimony, the trial court committed no error in refusing the full transcript of the taped interview or the tapes themselves." Majority Op. p. 86, 774 P.2d p. 256.

This language is not only extremely unfair to defense counsel, but the majority has seized upon the incorrect rule. Not only that, but the majority declines to inform its readers that the witness, Officer Newton, came to court with a complete transcript in his hands, and at some stages of giving testimony resorted to it. In *State v. Johnson,* 92 Idaho 533, 447 P.2d 10 (1968), in finding error, this Court recited "the then existing Idaho practice" with which in my practice I had many experiences. First of all, the true principle was learned in law school, and secondly it had been reduced to a written rule which is set out in the *Johnson* case:

> A witness is allowed to refresh his memory respecting a fact, by anything written by himself, or under his direction, at the time when the fact occurred, or immediately thereafter, or at any other time when the fact was fresh in his memory, and he knew that the same was correctly stated in the writing.

But in such case the writing must be produced, and may be seen by the adverse party, who may, if he choose, cross-examine the witness upon it, and may read it to the jury. So also a witness may testify from such a writing, though he retain no recollection of the particular facts, but such evidence must be received with caution. I.C. § 9–1204. *State v. Johnson, supra,* at 537, 447 P.2d 10.

Idaho Rule of Evidence 612 is much like the earlier § 9–1204. Rule 612 is readily available in the volume of court rules. As pertinent here, it provides that where a witness, while testifying, uses a writing or object to refresh his memory, or, where a witness before testifying uses a writing or object to refresh his memory, the adverse party (here the defendant Fain) is entitled to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness. This tape's only content was the entire interrogation as to Fain's activities at times pertinent.

That same rule requires of the party propounding the witness whose recollection has been thus refreshed to make "claims that the writing or object contains matters not related to the subject matter of the witness's testimony." Where such claim is made, the same rule provides that "the court shall examine the writing or object in camera, excise any portions not so related, and order delivery of the remainder to party entitled thereto."

In the instant case there was no such claim made by the prosecution. The majority, after having "most carefully reviewed the record," (Majority Op. p. 97, 774 P.2d p. 267) has not informed itself of the provisions of this rule. Yet the majority has the gall to accuse the public defender of failing to tailor his request.

Because the trial court, on hearing the prosecutor's objection to the tape (an object) or the tape transcript (a writing) being received in evidence, failed to have the reporter record the argument on the objection (the jury having been excused), we do not know the grounds upon which the pros-

ecutor argued. The prosecutor asked to approach the bench, the jury was taken out, the court invited both counsel to "come up" and the arguments were had. Tr., p. 648. But not taken by the reporter. A recess was taken. When proceedings resumed, the court stated that the ruling on the admissibility was reserved, but that cross-examination could proceed, "including that subject matter."

At this point there was further argument of counsel which was taken by the reporter, during which defense counsel stated:

Officer Newton, through examination by prosecution, has given bits and pieces of the two-hour, two and a half-hour interview, and the entire statement at this point is relevant to the jury, and the tape is the best evidence of the conversation, and not the recollection of Mr. Newton at this point.

The tape is available, and we ask that the entire conversation—the entire interview be admitted in fairness and due process requires that it be admitted.

Tr., Vol. III, p. 650. To this the Court responded, saying that he had never listened to the tape (not mentioning the transcript of the tape), but apparently the court put both in the same category, and added:

But it is also evident to me that a conversation of that nature may contain questions and answers which are subject to proper objection.

It may be redundant, and it may contain matters that—matters that are excluded under ordinary rules of evidence. Hearsay, and all kinds of things could be involved in that tape.

It's my position that unless a cause or a basis, inconsistencies for some reason is shown by the evidence to justify the inclusion of the entire tape, that it would be premature for me to admit it all this time.

Clearly the trial judge, having not heard the tape, surmised and speculated into not complying with the Rules of Evidence. Tr., Vol. III, p. 651. What happened when the trial judge was again confronted with making a ruling is best presented by going again to pertinent statements of counsel

and the court. First, defense counsel began by refreshing the court's memory:

> MR. BISHOP: Okay, Exhibit A is a taped interview conducted by Officer Hensen and Officer Newton of the defendant Charles Fain on October 27th, 1981, I believe—1982.
>
> It has been testified to by Officer Newton. It has been referred to by Officer Hensen.
>
> We have had pieces of the information, basically to refute the alibi, or where inconsistencies as to where Charles was during the period December, January, February, and March of 1981 and '82. On cross examination the—

Tr., Vol. V, p. 1217. The prosecutor objected to the admission, and the jury was excused.

Defense counsel continued:

> A is the tape recording of the interview conducted on—I believe it was testified it was two and a half hours on October 27th.
>
> Basically the officers testified as to what they considered inconsistencies in his statement with what we were to show here in court.
>
> The—there's denials contained in it, and we know there is denials contained on it.
>
> The prosecutor in his cross examination of Charles made reference to the transcript of that interview in attempting to impeach, or indicate recent fabrication of his testimony; and we feel in fairness, and under the law, that the jury, as the trier of fact, has the right to have all of the facts before it, and that those facts include not only the bits and pieces which have been referred to in that interview, but the entire interview.
>
> The testimony has been that the transcript was prepared by a secretary. It was listened to, but it was never compared, and the best evidence is the tape recording itself.
>
> It would also reflect the tone and the way in which the interview was conducted, and enable—in—in order to enable the jury to listen to the tape, and get the clearness of the tape, I would—as I know

the Court has done previously—ask that the tape be played and that the jury each be—presented with a copy of the prepared transcript so that they can follow along and hear their own wording what took place.

> I think that due process demands, and under the laws it demands that we have now had reference to that interview; that on—only parts of the interview had been placed into evidence, and it's only fair that the jury, as the trier of fact, hear it all, and let them be the determination of the credibility of all of the witnesses. Two primary witnesses, Mr. Hensen and Mr. Newton for the state, are on there, as well as Mr. Fain, and the jury has heard all of the testimony and the conflicts of the testimony between what parties have said versus where Mr. Fain was; and I believe that they're entitled to, or the defendant is entitled to—to have them hear the entire transcript— the entire interview that was conducted on the 27th, and based on that, we are asking that it be admitted.

Tr., Vol. V, pp. 1219–21. At this point the prosecutor stated the nature of his objection:

> MR. HARRIS: My objection, Your Honor, is goes to the hearsay declaration, and that's what it is, hearsay.
>
> Secondly, its' accumulative. The defendant has testified. The jury has that on which they can base any decision that they care to make in this case.
>
> It's accumulative in that the tape would overly emphasize whatever it is that counsel is arguing in the case, but it—but the hearsay part of it is … is perhaps the most cogent legal reason for its exclusion. It's obviously not under oath.
>
> It's an out-of-court statement, and if put in for the truth of the matters at are … incorporated therein, and there are, I think, some things in there that are legally objectionable, and would have to be edited in any event if it were to go to the jury. And I think for those reasons, that we should

Counsel has—has had every opportunity to impeach the witnesses that have appeared for the state and testified from that tape recording, or transcription. Had every opportunity to do that, and it seems to me that the effect of what he is requesting the Court to do is to set aside the—the legal requirements of evidence so that he can shotgun anything he wants to the jury, and—and the rules of evidence, and for good reasons, do not allow that kind of evidence to be presented.

For those reasons we object.

Tr., Vol. V, pp. 1221–22. Other less germane argument was made, after which the judge stated that he had not listened to the tape but gave his ruling:

In—in the first place, in my opinion, you have not established a proper foundation to introduce that tape into the record—into evidence, and you haven't made any argument or showing that that tape contains any evidence that is exculpatory as to the statement.

What you really want to do is—is add, or it's not really an addition. It's redundant is what it is. Is just go back through that, and have them—a jury deal with something that has never even been presented to the Court; and I—

I'm not going to permit it into evidence.

The people having testified, and their testimony is under oath here in court, and they were free to be cross examined and examined, and recused, and redirected, and as far as I'm concerned, that's the time to try your case, not by introducing tapes made outside the—when there is no showing of any—any basis that I can see in law for it—to admit that tape.

That's my position on it.

(Whereupon Defendant's Exhibit A, having been previously marked and offered, was refused.) [9]

Tr., Vol. V, pp. 1225–26.

The basic issue presented, however, and really the $64,000 question to be answered,

is that raised by the prosecution's success in swinging the court's thinking into the erroneous belief, and then ruling, that the defense counsel somehow had to establish the relevance of the entire tape. Where the rule reads just the opposite and it was the prosecution who utilized the tape and the transcript thereof as the basis for the testimony of officer Newton, it was incumbent for the prosecutor to show the irrelevance. It is difficult to conceive of any more prejudicial error that took place. The officers called defendant in for the interview; the officers arranged for the machine which would record the interview on a cassette tape; and they caused a transcript to be made. Officer Newton had the tape and the transcript present when he testified on behalf of the prosecution. The prosecution obviously believed that the taped interview and transcript thereof were essential to making a case against the defendant. Then, and exactly as defense counsel explained to the court, Officer Newton, in response to the prosecutor's questions, gave selective answers based on his recollection of what had been said by the defendant. Great trouble is experienced in understanding how the trial court allowed itself to be misled. Much greater trouble is encountered in comprehending how the majority, and why the majority, misportrays this important aspect of the case. This was a critical issue. The prosecution interviewed the defendant for two and one-half hours, two of them doing so, and having in their grasp an intellect so diminished—if one is willing to believe Chilton and Roberson—that he would readily detail his criminal activity to two strangers neither of whom he had ever seen before.

The two interrogating officers admitted that they could not exact a confession out of the defendant. Apparently the prosecutor thought their testimony important for use at trial in exploring any inconsistencies arising out of the long interrogation.

---

9. Similarly, the trial court ruled out Defendant's Exhibit C, a 10 to 20 minute audio-video tape at the time Fain was placed under arrest. On the prosecution's objection, the court ruled that "the object that it's hearsay and inadmissible for that purpose is also well taken—it's not admissible into evidence ..."

Clearly there was error in not allowing the jury to have all of the evidence which the tape and/or transcript would provide not just selected items at the prosecution's option.

In *State v. Sivak*, 105 Idaho 900, 674 P.2d 396 (1983), the court at sentencing received in evidence and utilized a tape, and typed transcript thereof, of an interview of Sivak's co-defendant, Bainbridge, notwithstanding that it was blatantly rank unsworn hearsay. *Sivak, supra*, at 917, 674 P.2d at 413. No direct mention of this was made in the majority opinion authored by Justice Bakes. Justice Bakes buried that aspect of the highly unusual procedure in this manner:

> The findings of the trial judge in sentencing are based not only on what he has heard during the trial, but also on the information he gathers from many other sources. A trial court's duty to tailor a sentence to an individual defendant necessitates access to a wide range of information about that defendant. *State v. Johnson*, 101 Idaho 581, 618 P.2d 759 (1980). This is especially true in cases involving the possible imposition of the death penalty, wherein the United States Supreme Court requires that the sentence be determined according to the requirements of each individual case. *See Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). The trial judge in the present case received an abundance of information during the sentencing portion of defendant's trial concerning the character of the defendant and his possible inclination. The trial judge thus issued his findings based on his access to this broad range of information.

105 Idaho at 907, 674 P.2d at 404.

Today, although the trial court error in regard to non-admission of the tape and transcript thereof is contextually different from the error in *Sivak* in admitting and utilizing the tape and transcript, both are equally egregious in unfairness and prejudice. Utterly incredible is the rationale by which the trial judge in the instant case could allow the officer to testify as to what defendant Fain said at the taped interview, and then rule the tape and transcript inadmissible as being hearsay.

That ruling, now affirmed by today's majority, should result in the rules of evidence being rewritten. The majority, instead of referring to the "then-Idaho evidentiary practice" and mistakenly declaring it the equivalent of an evidence rule promulgated after the defendant's trial, better would have contented itself with the applicable rule of evidence which was in effect. Any mention of Rule 106 should have been avoided.

Both the tape and the transcript thereof should have been admitted in evidence. It was indeed a question of best evidence, as defense counsel argued. The best evidence of what an interviewed accused has said, and the questions to which he is responding, is not recollections of the officer or officers who conducted the interrogation. It is difficult to conceive of any part of the tape which would not be relevant.

## IV

I do not disagree with Justice Huntley's general discussion on polygraph examinations and use thereof at trial. Note should be taken, however, that as to the many cases cited by him, he does not point to any single one as being illustrative of the particular context in which the issue arose in this case.

A suspect, in this case, Fain, is detained and asked by the authorities if he will volunteer to submit to such an examination and is given no promise that it will not be used against him. In fact, there is every reason for him, and the authorities, to expect that if adverse to his circumstances, it will be used against him.

My understanding of fair play requires that: (1) He be allowed to tell the jury that he volunteered to take the test; (2) That the jury be allowed to know the results of the test; (3) That both the authorities and the defendant be allowed to examine the polygraph examiner; and (4) That the court instruct the jury as to the use which can be made of these requirements, which would not be that it is by any means conclusive.

It is simply wrong, albeit not illegal, to ask a person to submit to such testing, and where he agrees to do so, then deprive him of letting the jury know that he has done so. Justice Huntley has written that the results are inadmissible absent a stipulation of both parties. Question: Is not the law enforcement authority requesting that a defendant/accused/suspect take the test implicitly so agreeing? If not, then is he in good faith in so requesting? Where the accused agrees to take the test, and exacts from the authority no agreement that it cannot be used against him, too, is not he so agreeing?

In the long-run police work will be made easier by a ruling which encourages suspects to be examined. A suspect who passes the test more often than not is not a viable suspect, and the officers can devote their time investigating others. One wonders at the wide-spread use of polygraph testing in government and business circles, if it serves no valid purpose.

## V

I concur with what Justice Johnson has written, adding only that it is the state authorities who most often profit by such testing as was done here. For many, many years now anyone connected with law enforcement has known this to be so. One can only surmise that from the top echelon of law enforcement down, somewhere along the line law enforcement was not adequately informed and instructed as to procedures to be followed. It makes no sense for anyone to put the blame on the doctor who, after all, was under the direction of the officer.

The majority opinion painstakingly reviews pages and pages of cases from other jurisdictions in discussing the problem with the disposed evidence, culminating with the conclusion that: "[t]he remedy of retrial, rather than dismissal, was also found appropriate in *Commonwealth v. Chapman*, 255 Pa.Super. 265, 386 A.2d 994 (Pa.1978)." Majority Op. at 96, 774 P.2d at 266. At this point it appeared that the opinion was about to climax with a Rule of Law. Not so, however. Instead, in what will be seen

as an outstanding *ipse dixit*, the majority opinion states: *"[b]ased on the foregoing analysis*, we have determined that the State did not deprive the defendant of due process by failing to preserve the semen samples it had obtained." *Id*. at 96, 774 P.2d at 266. Hopefully some astute member of the trial bench or bar, or a legal scholar will in time explain to me what exactly was the analysis.

The majority opinion then proceeds to accept, utilize, and emphasize the weight of the testimony of the two cell mates which is strangely included with the pubic hair similarity and a witness description of the car the victim was last seen riding, after which it is "concluded that although the evidence against Fain is circumstantial, it is nonetheless significant and weighty." This seemingly is meant to serve as a predicate for the ensuing sentence which states that "dismissal would be an overly severe sanction." (Majority Op., p. 97, 774 P.2d p. 267). No one on this Court to my knowledge has ever considered dismissal.

Having thus ruled out dismissal of the case, the majority opinion astounds me, and I am certain also the trial bar, that a "most carefully reviewed ... record" results in the conclusion that if there were a retrial "there is no likelihood that the result would be changed." In that summary manner the majority abolish this defendant's right to a jury trial free of error.

I agree that due process does not demand that the charges be dismissed. But a new trial is warranted, as in *Chapman*, *supra*, the precedent upon which the majority relies.

A new trial would serve no purpose, so says the majority, because "there is no likelihood that the result would be changed." *Id*. at 97, 774 P.2d at 267. This usurpation of the jury's role is troubling, considering that there is no direct evidence in the record upon which a conviction could lie. Under the circumstances here the words "circumstantial evidence" and "overwhelming" are oxymoronic. Thus, I concur with Justice Johnson's view that due process mandates a new trial,

whereupon Fain's requested instruction,[10] be given to the jury. As one commentator has stated:

> We must either trust the jury or get rid of it. One cannot afford to sympathize for long with the view that a legal system must carry the burden of fictitious and obscurantist doctrine in order to keep vital issues away from that tribunal which was constituted to decide them.[11]

## VI

Contrary to the conclusion of the majority, the I.C. § 19–2515(g)(5) and (6) aggravating circumstances are duplicative.[12] *Every* murderer who exhibits "utter disregard for human life" commits a crime which is "especially heinous, atrocious or cruel manifesting exceptional depravity." Today, however, the majority in concludes that the aggravating factors describe two "quite *different* kinds of culpability." The majority states:

> The particularly cold-blooded killer *need not* act sadistically or in particularly *outrageous fashion* in order to commit a killing with *utter disregard for human life.* One who commits a crime in an especially heinous way is punished for the heinousness of his crime, not because he acted with utter disregard for

human life, although it may be expected that most especially heinous, atrocious or cruel murders will have been committed with utter disregard for human life.

Majority Op. at 99, 774 P.2d at 269 (emphasis added).

Thus, according to the majority, a "cold-blooded killer *need not*" act in an "outrageous fashion" to commit a murder "with utter disregard for human life." I cannot fathom a first degree murder which is not carried out in an "outrageous fashion." Every premeditated murder is outrageous.

The (g)(5) and (6) subsections are nothing more than kitchen sink aggravating circumstances which enable the state to make *every* first degree murderer not just a candidate for, but an actual recipient of, the harshest and most final of all criminal penalties. As a result, the mandate to narrow the class of death-eligible murders is abandoned.

## VII

I am unable to agree with Part VII. In addition to what was written in my prefatory remarks and elsewhere in my opinion, I think that the mandatory review cannot and should not be delayed.

---

**10.** Find in Justice Johnson's dissent and concurrence at 56.

**11.** Hughes, "Duties to Trespassers: A Comparative Survey and Revaluation," 68 Yale L.J. at 700 (1959).

**12.** I.C. § 19–2515(g) provides:

The following are statutory aggravating circumstances, at least one (1) of which must be

found to exist beyond a reasonable doubt before a sentence of death can be imposed.
. . . .
(5) The murder was *especially heinous, atrocious or cruel, manifesting exceptional depravity.*
(6) By the murder or circumstances surrounding its commission, the defendant *exhibited utter disregard for human life.*
(Emphasis added.)

APPENDIX A

# SEX CRIMES

*#8.*
*Evidence*

**FOR USE IN THE ⬛⬛⬛ ICAL EVIDENCE**
**IN ALL CATEGORIES OF ⬛⬛⬛**

*#X*

To Examining Physician/Nurse:

1. This kit contains materials for collecting evidence in alleged sex crimes. There are eleven (11) separate steps to be completed.

2. Directions for each step are printed on the appropriate envelope or packet.

3. Each specimen or sample taken must be clearly identified. Therefore, it is recommended that this kit be opened, and prior to actually collecting the evidence, that all the appropriate identifying data be placed on the various containers.

STEP 1 DEBRIS COLLECTION
STEP 2 GENITAL SWABBING
STEP 3 DRIED SECRETIONS
STEP 4 COMB & PUBIC COMBINGS
STEP 5 PUBIC HAIR - PULLED
STEP 6 HEAD HAIRS - PULLED
STEP 7 FINGERNAIL SCRAPINGS, RIGHT & LEFT
STEP 8 SALIVA SAMPLE
STEP 9 SMEAR SAMPLES - ORAL, ANAL, VAGINAL
STEP 10 WHOLE BLOOD SAMPLE
STEP 11 NASAL MUCOUS SAMPLE

**UNDER NO CIRCUMSTANCES SHOULD SAMPLES TAKEN FROM A SUSPECT BE PLACED IN THE SAME KIT AS THOSE FROM THE PATIENT.**

[ ] MALE [X] FEMALE

PATIENT _____ MED. REC. NO. _____
EXAMINING PHYSICIAN _____
ATTENDING NURSE _____
_____ 2-27-8_ _____ HOSPITAL/CLINIC _____
PHONE NO. _____ WITNESS _____

FOR LAW ENFORCEMENT AGENCY USE ONLY
CASE NO. _____ DATE/TIME OF INCIDENT _____
INVESTIGATING OFFICER _____

CHAIN OF POSSESSION
1._____ 4._____
2._____ 5._____
3._____ 6._____

LAB USE ONLY
LAB. NO. _____
DATE REC'D _____
EXAMINED BY _____

MANUFACTURED BY

## SIRCHIE®

**FINGER PRINT LABORATORIES**
RALEIGH, NORTH CAROLINA 27612
PHONE: (919) 781-3120 TELEX: 57-9370

# STEP 2 - GENITAL SWABBiNG

1. Remove the enclosed sterile pad and moisten lightly with distilled water.
2. Swab the vulva and the inner portions of the thighs adjacent to the area
3. Flatten out the pad and place it in the enclosed "Genital Swabbing specimen envelope
4. Seal the specimen envelope and reseal it in this envelope
5. Return this envelope to the kit.

DATE/TIME _____
PATIENT _____
COLLECTED BY _____

CAT NO CC102 SIRCHIE FINGER PRINT

# GENITAL SWABBING

DATE _____

INITIALS _____

CAT NO CC102 SIRCHIE FINGER PRINT LABS